JOHN HAMILTON, SUPERINTENDENT, SPRING GROVE STATE HOSPITAL ET AL. *v.* WALTER E. VERDOW, Pers. Rep. of the Estate of Jason S. Verdow, Infant

[Misc. No. 4, September Term, 1979.]

*Decided May 23, 1980.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, ORTH, COLE and DAVIDSON, JJ.

*Randall M. Lutz, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellants.

*Leroy W. Preston,* with whom were *O'Connor, Preston, Glenn & Smith, P.A.* on the brief, for appellee.

ELDRIDGE, J., delivered the opinion of the Court.

Pursuant to the Maryland Uniform Certification of Questions of Law Act, Maryland Code (1974, 1980 Repl. Vol.), § 12-601 of the Courts and Judicial Proceedings Article, the United States District Court for the District of Maryland has certified to this Court two questions of Maryland law. In general, they are (1) whether, in the circumstances of this case, Code (1957, 1979 Repl. Vol.), Art. 59, § 19, prohibits the discovery from a State mental hospital of a former patient's medical records, and (2) whether the doctrine of executive privilege prevents the discovery and the *in camera* inspection by the court of a confidential report prepared for and at the order of the Governor of Maryland.

The underlying facts are as follows. On several occasions, Arthur F. Goode, III, was a patient at Spring Grove State Hospital, located in Catonsville, Maryland. The most recent occasion began in September 1975, when Goode voluntarily entered the hospital as a condition of probation after he was found guilty of sexually molesting young boys by the District Court of Maryland sitting in Prince George's County.

In February 1976, Goode left the hospital and went to Florida to visit his parents. While in Florida, Goode killed a

young boy, Jason S. Verdow. Afterwards, Goode returned to Maryland and then traveled to Virginia where he killed another youth, Kenneth Dawson. Goode was subsequently convicted of murder in Virginia and in Florida, and he is presently incarcerated in Florida awaiting execution.

The personal representative of the estate of Jason S. Verdow, the Florida murder victim, began this federal diversity action against the superintendent of Spring Grove State Hospital and two staff psychiatrists. The complaint alleged that although the defendants knew that Goode had frequently been convicted of sexually molesting young boys and had previously been diagnosed as a sexual deviate, they negligently recommended that Goode should be treated at Spring Grove rather than at a maximum security institution. The complaint further alleged that the defendants negligently diagnosed the severity of Goode's condition, resulting in a failure to prescribe an adequate method of treatment. Finally, the plaintiff asserted that the defendants permitted Goode to leave the institution without notifying any appropriate authority even though they knew that Goode had not responded to treatment and still possessed the capacity to commit criminal acts.

During the course of discovery, the plaintiff noted two depositions. The first was to the custodian of medical records at Spring Grove, by which the plaintiff sought to discover the medical records maintained by Spring Grove which related to Goode. The second notice was to Judge Alan M. Wilner of the Maryland Court of Special Appeals, and it was accompanied by a subpoena to produce a copy of an investigative report which concerned the handling of Goode at Spring Grove, and which was prepared by Judge Wilner while he was serving on the staff of the Governor of Maryland. The Maryland Attorney General filed motions for protective orders, asserting that the documents sought by the plaintiff were privileged and confidential by law. An affidavit claiming a "privilege as Chief Executive Officer of the State of Maryland" to withhold the Wilner Report from discovery was also submitted by the Acting Governor of

Maryland.[1] In general, the affidavit alleged that the report was a confidential report, prepared for the purpose of future executive action in order to attempt to prevent other similar occurrences at state facilities, and contained opinions and recommendations for the Governor's use as well as other confidential, personal information relating to Goode.

The United States District Court initially ordered that the documents should be produced for an *in camera* inspection in order to determine the extent to which they were discoverable. By letter, the Attorney General of Maryland requested that the federal court reconsider its order for an *in camera* inspection or, in the alternative, certify to this Court the legal questions of whether the documents were privileged. Finding that there was no controlling precedent in the decisions of this Court, the United States District Court certified the following questions:

> "(1) Do the provisions of Article 59 § 19, *Annotated Code of Maryland* (1978 Cum. Supp.) prohibit the discovery of a former patient's records at a facility, where the former patient has not expressly waived his privilege under C & JP Art., § 9-109, *Annotated Code of Maryland* (1974) for purposes of this litigation?
>
> "(2) Is the investigative report concerning the circumstances surrounding the Arthur F. Goode, III, case, compiled in confidence for the Governor of Maryland at his request for the purpose of potential future executive action in order to attempt to prevent or minimize similar occurrences by identifying and assessing any deficiencies within the governmental systems, barred from discovery

---

1. During the period of time relevant to this case, three persons have exercised the duties of the office of Governor of Maryland. The investigative report prepared by Judge Wilner was requested by, and later submitted to, Governor Marvin Mandel. The initial claim of executive privilege in this case was thereafter made by Acting Governor Blair Lee, III. The claim of executive privilege regarding the Wilner Report has been reiterated by the present Governor, Harry R. Hughes. Hereinafter in this opinion, we shall simply use the term "Governor" without distinguishing among the three individuals who have exercised the duties of the office.

and *in camera* inspection by the federal court on the basis of executive privilege?"[2]

### (1)

The first certified question is whether Art. 59, § 19, of the Maryland Code prohibits the discovery of the medical records at Spring Grove State Hospital which relate to Goode unless he has expressly consented to their release for use in this litigation. Article 59, § 19, which is made applicable to Spring Grove by Art. 59, § 3 (e), provides:

> "Each facility which has, as patients, any persons admitted under the provisions of this subtitle, shall make and retain in a separate and secure area of the facility, complete records of each such patient. Such records shall contain copies of all data required by this article, and such additional information as may be required by the Department. Such records *shall be open* for inspection by persons designated by the Commissioner and *in accordance with the provisions of § 9-109 of the Courts Article of the Code,* but shall be closed to all other persons." (Emphasis supplied.)

The relevant provisions of § 9-109 of the Courts and Judicial Proceedings Article provide:

> "(b) *Privilege generally.* — Unless otherwise provided, in all judicial, legislative, or

---

2. The relevance of Maryland law regarding privilege stems from the provisions of Rule 501, Federal Rules of Evidence, which provides:

"Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law."

administrative proceedings, a patient or his authorized representative has a privilege to refuse to disclose, and to prevent a witness from disclosing, communications relating to diagnosis or treatment of the patient's mental or emotional disorder.

\* \* \*

"(d) *Exclusion of privilege.* — There is no privilege if:

\* \* \*

"(6) The patient expressly consents to waive the privilege, or in the case of death or disability, his personal or authorized representative waives the privilege for purpose of making claim or bringing suit on a policy of insurance on life, health, or physical condition."

Goode has previously authorized the release of the medical records at Spring Grove to various persons. In 1976, Goode authorized Wilbur C. Smith, III, his attorney in the Florida criminal proceedings, and Judge Wilner to examine, copy and have access to any personal, health or school records relating to him. In 1979, Goode signed a release requesting that Spring Grove Hospital release "any and all medical records, or physicians' records and reports . . . including . . . notes from any psychiatrist(s), notes from any psychologist(s), . . . and any other contained notes and data" to Henry R. Furr, administrator of the estate of Kenneth A. Dawson, the Virginia murder victim. Mr. Furr, as the administrator of Dawson's estate, has brought an action in the Circuit Court for Baltimore County against Spring Grove State Hospital, and Dr. Williams and Dr. Bartley, who are also defendants in this litigation. That Baltimore County suit involves substantially the same legal and factual issues as are presented in the instant case. To date, however, Goode has specifically refused to consent to the release of his medical records to the plaintiff in this action.

The plaintiff asserts that Goode has waived any privilege of confidentiality that he might have for the medical records

at Spring Grove by authorizing the release of his records to Judge Wilner, to his attorney Mr. Smith, and to Mr. Furr. In addition, the plaintiff maintains that Goode waived any privilege by revealing all or part of the information contained in the records by his testimony in a deposition and in the various criminal proceedings against him.

In response, the defendants point to the principle that, under some circumstances, a waiver may be conditional and limited in scope. The defendants argue that because Goode has expressly refused to release his medical records to the plaintiff in the present case, his waiver was intended to be limited to those persons who were expressly authorized to examine the records. The waiver, according to the defendants, may not be construed to apply to the plaintiff here.

Referring particularly to Goode's authorization to Judge Wilner, the defendants contend that Goode only gave a qualified consent, and thereby demonstrated the lack of an intent to waive generally his privilege, because he stated that it was given "after discussion and explanation with my attorney."

In our view, by executing a release of his medical records to Mr. Furr, Goode has waived his statutory privilege with respect to the plaintiff in this case. Consequently, in light of our disposition of this issue on the basis of Goode's release to Furr, we do not decide whether Goode's release of the records to Judge Wilner and to Mr. Smith, or his other actions, would also constitute a waiver of the privilege under § 9-109 (d) (6) of the Courts and Judicial Proceedings Article.

The defendants principally rely on *Roberts v. Superior Court of Butte County,* 9 Cal. 3d 330, 508 P.2d 309, 316-317, 107 Cal. Rptr. 309 (1973), for the proposition that a waiver of a privilege may be conditioned and limited in scope. In *Roberts,* the Supreme Court of California held that the plaintiff, by signing a consent form permitting the defendant's insurer to acquire information regarding the plaintiff's " 'medical history, physical condition and treatment rendered,' " did not generally waive her

psychotherapist-patient privilege. 508 P.2d at 317. We do not believe that *Roberts* is at all apposite. In that case, the court was determining whether a waiver of *some* part of the information in a person's medical history, *i.e.,* that which related to prior physical conditions, was also a waiver of *other types* of medical information. Moreover, the waiver in *Roberts* was only for the different, and limited, purpose of permitting the defendant's insurer to investigate the physical injury that the plaintiff had sustained in an accident with the defendant. Consequently, *Roberts* does not support the defendants' position under the circumstances of the present case.

In contrast to the factual situation in *Roberts,* Goode released *all* of his medical records at Spring Grove to Furr in order that they could be used by Furr in the Baltimore County tort suit. The records are not only identical to the materials that are sought by the plaintiff in the present case, but the plaintiff here is bringing a virtually identical tort suit and would be using the records for the same purpose. Moreover, Goode released the records without any express limitations on the use or further distribution of the records by Furr.

In certain circumstances, as in *Roberts,* a waiver of a privilege may be limited to a specific use or purpose. However, courts have generally held that once a person waives his privilege by revealing, or permitting to be revealed, certain information, then the privilege will no longer be permitted to protect that same information from use or disclosure to the same or a similarly situated party who will use the information for the same purpose. In these circumstances, therefore, a prior waiver of the privilege is generally regarded as a waiver to the subsequent discovery or use of that information at a later trial of the same issues, or even unrelated issues. *See, e.g., Steen v. First Nat. Bank,* 298 F. 36 (8th Cir. 1924); *Daniels v. Hadley Memorial Hospital,* 68 F.R.D. 583 (D.D.C. 1975); *Metropolitan Life Ins. Co. v. Kaufman,* 104 Colo. 13, 87 P.2d 758 (1939); *Pittsburgh, C., C. & St. L. Ry. Co. v. O'Conner,* 171 Ind. 686, 85 N.E. 969 (1908); *Elliott v. Kansas City,* 198 Mo. 593, 96

S.W. 1023 (1906); *Unick v. Kessler Memorial Hospital,* 107 N.J. Super. 121, 257 A.2d 134 (1969); *People v. Bloom,* 193 N.Y. 1, 85 N.E. 824 (1908); *General American Life Ins. Co. v. Ettinger,* 266 A.D. 876, 42 N.Y.S.2d 836 (1943); *see also Travelers Indemnity Co. v. Cochrane,* 155 Ohio St. 305, 98 N.E.2d 840 (1951).

Applying this principle to the facts of this case, it is apparent that Goode may not selectively waive his privilege relating to the medical information by arbitrarily picking and choosing among similarly situated parties, at least when it is the same information requested by each party and for the same purpose. In order to permit a selective waiver, there should be some reasonable basis for distinguishing between two different situations. In this case, however, there is no rational ground for distinguishing between Goode's waiver of his entire medical file to Furr when that information is identical to the information requested by the plaintiff. Both Furr and the plaintiff brought suits that involve substantially the same defendants and that are predicated on virtually identical facts and allegations. Both parties intended to use the information for the same purpose. Accordingly, by expressly authorizing the Furr plaintiff to obtain the medical records, Goode has similarly waived his statutory privilege with respect to discovery by the plaintiff in the present action. The answer to the first certified question is "No."

(2)

The issues presented by the second certified question are whether the Wilner Report is barred from discovery and *in camera* inspection by the doctrine of executive privilege.[3]

---

3. This doctrine is also sometimes referred to as the privilege for "governmental secrets," *McCormick On Evidence* §§ 106-107 (2d ed. 1972), or as the "state secret privilege" and "official information privilege," Wallace, *Government Documents,* 76 Colum. L. Rev. 142 (1976). As pointed out in the latter article, footnote 2, the doctrine of "executive privilege" encompasses both the privilege for state and military secrets as well as the privilege for certain "official information."

The phrase "executive privilege" may well be an overly narrow term, because the privilege extends beyond the executive branch of government.

According to the affidavit claiming that the Wilner Report was privileged, the Governor requested that Judge Wilner, then the Governor's staff attorney and Chief Legislative Officer, investigate, in strictest confidence, and report directly to the Governor, the circumstances surrounding the Goode case for the purpose of "potential future executive action in order to attempt to prevent or minimize similar occurrences by identifying and assessing any deficiencies within the governmental systems that were reflected in that case." The gubernatorial affidavit went on, in relevant part, to describe the report as follows:

> "3. After extensive investigation and information gathering, a report was issued by Mr. Wilner to the Governor on June 28, 1976. . . . The information contained confidential data concerning Arthur F. Goode, III, and conclusions and recommendations to the Governor for possible future executive action.
>
> "4. Based upon information supplied to me by Mr. Wilner . . ., I am informed that all communications and records from which information was obtained was with the qualified consent of Arthur F. Goode, III, and originated in confidence, and was to be kept in confidence. I am also informed that almost all of the records used for gathering facts were also confidential by Federal or State law. Mr. Wilner urged that the information be kept strictly confidential for these reasons.

\* \* \*

As it has roots in the constitutional doctrine of separation of powers, a similar privilege extends to the judicial and legislative branches as well. *See* United States v. Nixon, 418 U.S. 683, 705, 94 S. Ct. 3090, 41 L. Ed. 2d 1039 (1974); United States v. Morgan, 313 U.S. 409, 422, 61 S. Ct. 999, 1004-1005, 85 L. Ed. 1429 (1941); Senate Select Committee on Pres. Cam. Act. v. Nixon, 498 F.2d 725, 729 (D.C. Cir. 1974); Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena, 40 F.R.D. 318, 325-326 (D.D.C. 1966), *aff'd sub nom.* V.E.B. Carl Zeiss, Jena v. Clark, 384 F.2d 979 (D.C. Cir. 1967), *cert. denied,* 389 U.S. 952, 88 S. Ct. 334, 19 L. Ed. 2d 361 (1967).

Nevertheless, because the term "executive privilege" is the one most often used to encompass the privilege here involved, we shall continue to use it.

"7. I have personally examined the report as the Acting Governor and Chief Executive Officer of the State, and have found the information contained therein to be strictly confidential in nature, containing information that is confidential by law and information that is highly personal to Mr. Goode and to his family.

"8. The report was in the nature of an interoffice communication containing opinions, recommendations, and deliberations of the Governor's attorney for use by the Governor in deciding what executive action, if any, was appropriate. . . .

\* \* \*

"10. Production or disclosure of the documents would be contrary to the overriding public interest, in that:

 a. The policy and decision-making processes of the Governor and the Executive Branch would be totally thwarted if they were required to reveal the opinions, recommendations, and deliberations used in arriving at policy decisions. Executive officers would be inhibited from deliberating and deciding policy issues of vital importance to the State, its agencies and its citizens, if they were required to reveal the methods and influences considered in arriving at the policy decision.

 b. If production and disclosure were allowed, the public's trust and confidence to speak freely with executive officers conducting investigations would be severely inhibited.

 c. Representations were made to sources of information for the report that the data would be held in strictest confidence. If the report is permitted to be disclosed, the

> confidence and trust in State Government
> of those sources and potential future
> sources from the general public would be
> seriously impaired."

We are not aware of any prior cases in this Court expressly dealing with the doctrine of executive privilege. Our cases have recognized, however, that the Governor bears the same relation to this State as does the President to the United States, and that generally the Governor is entitled to the same privileges and exemptions in the discharge of his duties as is the President. *Magruder v. Swann, Governor,* 25 Md. 173, 212 (1866); *Miles v. Bradford, Governor of Maryland,* 22 Md. 170, 184-185 (1864). In addition, we have observed, in various circumstances, that the principles behind the constitutional separation of powers, Art. 8 of the Maryland Declaration of Rights,[4] place limits on a court's power to review or interfere with the conclusions, acts or decisions of a coordinate branch of government made within its own sphere of authority. *See, e.g., Dep't of Nat. Res. v. Linchester,* 274 Md. 211, 218, 223-225, 334 A.2d 514 (1975); *Heaps v. Cobb,* 185 Md. 372, 45 A.2d 73 (1945); *Magruder v. Swann, Governor, supra; Miles v. Bradford, Governor of Maryland, supra; Green v. Purnell, Comptroller of the Treasury,* 12 Md. 329 (1858); *Watkins v. Watkins,* 2 Md. 341 (1852).

Moreover, it is apparent from the very nature of government that a legitimate necessity exists for the protection from public disclosure of certain types of official information. Thus, at least as early as 1807, in the treason trial of Aaron Burr, Chief Justice Marshall, sitting on the circuit court, recognized the potential existence of an executive privilege from discovery for official governmental information and confidential communications to the

---

4. Article 8 of the Maryland Declaration of Rights provides:

"That the Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other."

executive. *United States v. Burr,* 25 Fed. Cas. 187, 191-192 (C.C. Va. 1807) (Fed. Cas. No. 14,694). The Chief Justice acknowledged that, as a matter of public interest, President Jefferson might be able to prevent the disclosure by a potential prosecution witness of a letter to the President which allegedly contained state diplomatic secrets. Chief Justice Marshall observed (*id.* at 191-192):

> "That the president of the United States may be subpoenaed, and examined as a witness, and required to produce any paper in his possession, is not controverted. I cannot, however, on this point, go the whole length for which counsel have contended. The president, although subject to the general rules which apply to others, *may have sufficient motives for declining to produce a particular paper, and those motives may be such as to restrain the court from enforcing its production.* I do not think precisely with the gentlemen on either side. I can readily conceive that the president might receive a letter which it would be improper to exhibit in public, because of the manifest inconvenience of its exposure. The occasion for demanding it ought, in such a case, to be very strong, and to be fully shown to the court before its production could be insisted on. I admit, that *in such a case, much reliance must be placed on the declaration of the president; and I do think that a privilege does exist to withhold private letters of a certain description.* The reason is this: Letters to the president in his private character, are often written to him in consequence of his public character, and may relate to public concerns. Such a letter, though it be a private one, seems to partake of the character of an official paper, and to be such as ought not on light ground to be forced into public view." (Emphasis supplied.)

*See also United States v. Burr,* 25 Fed. Cas. 30, 37-38 (C.C. Va. 1807) (Fed. Cas. No. 14,692d).

The necessity for some protection from disclosure clearly extends to confidential advisory and deliberative communications between officials and those who assist them in formulating and deciding upon future governmental action. A fundamental part of the decisional process is the analysis of different options and alternatives. Advisory communications, from a subordinate to a governmental officer, which examine and analyze these choices, are often essential to this process. The making of candid communications by the subordinate may well be hampered if their contents are expected to become public knowledge. As one commentator has observed:

> "[T]here are two reasons for preserving the confidentiality of intragovernmental documents reflecting advisory opinions, recommendations and deliberations comprising parts of the process by which governmental decisions and policies are formulated: (1) to encourage aides and colleagues to give completely candid advice by reducing the risk that they will be subject to public disclosure, criticism and reprisals; (2) to give the President or other officer the freedom 'to think out loud,' which enables him to test ideas and debate policy and personalities uninhibited by the danger that his tentative but rejected thoughts will become subjects of public discussion." Cox, *Executive Privilege,* 122 U. Pa. L. Rev. 1383, 1410 (1974).

In *United States v. Nixon,* 418 U.S. 683, 705, 94 S. Ct. 3090, 41 L. Ed. 2d 1039 (1974), the Supreme Court pointed to the

> "valid need for protection of communications between high Government officials and those who advise and assist them in the performance of their manifold duties; the importance of this confidentiality is too plain to require further discussion. Human experience teaches that those who expect public dissemination of their remarks

may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process."

Mr. Justice Reed, sitting by designation on the United States Court of Claims in the leading case of *Kaiser Aluminum & Chemical Corp. v. United States,* 141 Ct. Cl. 38, 157 F. Supp. 939 (1958), holding that a memorandum containing advice on policy from a subordinate to the General Services Administrator was privileged, explained for the court (157 F. Supp. at 946-947):

"There is a public policy involved in this claim of privilege for this advisory opinion — the policy of open, frank discussion between subordinate and chief concerning administrative action.

"When this Administrator came to make a decision on this $36,000,000 contract, with intricate problems of accounting and balancing of interests, he needed advice as free from bias or pressure as possible. It was wisely put into writing instead of being left to misinterpretation but the purchaser, plaintiff here, was entitled to see only the final contracts, not the advisory opinion.

" . . . The document sought here was a part of the administrative reasoning process that reached the conclusion embodied in the contracts with Kaiser and Reynolds. The objective facts, such as the cost, condition, efficiency, terms and suitability are otherwise available. So far as the disclosure of confidential intra-agency advisory opinions is concerned, we conclude that they belong to that class of governmental documents that are privileged from inspection as against public interest . . . .

" . . . [T]he demand for this document seeks to lay bare the discussion and methods of reasoning of public officials. The fact that the author is dead is immaterial here. It is not a privilege to protect the

official but one to protect free discussion of prospective operations and policy. . . ."

In another leading case, *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena,* 40 F.R.D. 318 (D.D.C. 1966), *aff'd sub nom. V.E.B. Carl Zeiss, Jena v. Clark,* 384 F.2d 979 (D.C. Cir. 1967), *cert. denied,* 389 U.S. 952, 88 S. Ct. 334, 19 L. Ed. 2d 361 (1967), upholding the United States Attorney General's claim of executive privilege with regard to several intra-departmental and inter-departmental memoranda in the possession of the United States Department of Justice, containing opinions, recommendations and deliberations pertaining to decisions of the Department, the court pointed out that there are two different policies underlying the privilege. As to the first, the court stated (40 F.R.D. at 324-325):

> " . . . In striking the balance in favor of nondisclosure of intra-governmental advisory and deliberative communications, the privilege subserves a preponderating policy of frank expression and discussion among those upon whom rests the responsibility for making the determinations that enable government to operate . . . .
>
> " . . . It is evident that the Department, to function adequately, must depend heavily upon candid exchanges of ideas, not only among its own staff but also, particularly because of the institutional nature of its decisions, with other agencies whose interests are involved.
>
> "To the extent that such communications may later be scrutinized by others, the communicative process itself becomes embarrassed. . . ."

The court went on to set forth the second policy justifying the privilege (*id.* at 325-326):

> "As important as are these considerations, the cases, analyzed critically, demonstrate that the immunity of intra-governmental opinions and

deliberations also rests upon another policy of equal vitality and scope. The judiciary, the courts declare, is not authorized 'to probe the mental processes' of an executive or administrative officer. This salutary rule forecloses investigation into the methods by which a decision is reached, the matters considered, the contributing influences, or the role played by the work of others — results demanded by exigencies of the most imperative character. No judge could tolerate an inquisition into the elements comprising his decision — indeed, '[s]uch an examination of a judge would be destructive of judicial responsibility' — and by the same token 'the integrity of the administrative process must be equally respected.' Identically potent reasons dictate that protection no less extensive be afforded the processes by which the Attorney General's responsibilities for decisional and policy formulations, legal or otherwise, are discharged."

In light of these considerations, the cases throughout the country, both federal and state, have recognized the doctrine of executive privilege which, in addition to state and military secrets, gives a measure of protection to the deliberative and mental processes of decision-makers. *See, e.g., United States v. Nixon, supra,* 418 U.S. at 705-710; *United States v. Reynolds,* 345 U.S. 1, 73 S. Ct. 528, 97 L. Ed. 727 (1953); *United States v. Morgan,* 313 U.S. 409, 422, 61 S. Ct. 999, 1004-1005, 85 L. Ed. 1429 (1941); *Morgan v. United States,* 304 U.S. 1, 18, 58 S. Ct. 999, 82 L. Ed. 1129 (1938); *Senate Select Committee on Pres. Cam. Act. v. Nixon,* 498 F.2d 725 (D.C. Cir. 1974); *Nixon v. Sirica,* 487 F.2d 700, 713 (D.C. Cir. 1973); *Davis v. Braswell Motor Freight Lines, Inc.,* 363 F.2d 600, 603-605 (5th Cir. 1966); *Machin v. Zuckert,* 316 F.2d 336 (D.C. Cir. 1963), *cert. denied,* 375 U.S. 896, 84 S. Ct. 172, 11 L. Ed. 2d 124 (1963); *Boeing Airplane Company v. Coggeshall,* 280 F.2d 654, 660-662 (D.C. Cir. 1960); *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena, supra; Kaiser Aluminum & Chemical Corp. v.*

*United States, supra; Assured Inv'rs Life Ins. Co. v. Nat. U.
Assoc.,* 362 So. 2d 228, 233 (Ala. 1978); *Thompson v. German
Valley R. Co.,* 22 N.J. Eq. 111 (1871); *Cirale v. 80 Pine Street
Corporation,* 35 N.Y.2d 113, 316 N.E.2d 301, 359 N.Y.S.2d
1 (1974); *Appeal of Hartranft,* 85 Pa. 433 (1877).

The executive privilege concept has been considered part
of the common law of evidence. *Ethyl Corporation v.
Environmental Protection Agency,* 478 F.2d 47, 51 (4th Cir.
1973); *McCormick on Evidence* § 107 (2d ed. 1972); Carrow,
*Governmental Nondisclosure,* 107 U. Pa. L. Rev. 166,
169-170 (1958); Hardin, *Executive Privilege,* 71 Yale L.J.
879, 881 (1962); Wallace, *Government Documents,* 76
Colum. L. Rev. 142, 156 (1976). *Cf. NLRB v. Sears, Roebuck
& Co.,* 421 U.S. 132, 150-152, 95 S. Ct. 1504, 44 L. Ed. 2d 29
(1975). In addition, it is clear that the doctrine of executive
privilege also has a basis in the constitutional separation of
powers principle. As recently observed by the Supreme
Court in *United States v. Nixon, supra,* 418 U.S. at 705, "the
privilege can be said to derive from the supremacy of each
branch within its own assigned area of constitutional
duties." And later (*id.* at 708): "The privilege is fundamental
to the operation of Government and inextricably rooted in
the separation of powers under the Constitution." *See also
United States v. Reynolds, supra,* 345 U.S. at 6 n. 9; *Dellums
v. Powell,* 561 F.2d 242, 246 (D.C. Cir. 1977), *cert. denied,*
434 U.S. 880, 98 S. Ct. 234, 54 L. Ed. 2d 160 (1977); *Ethyl
Corporation v. Environmental Protection Agency, supra,*
478 F.2d at 51; *Soucie v. David,* 448 F.2d 1067, 1071 n. 9
(D.C. Cir. 1971).

In light of the reasons underlying the privilege, and
considering the express separation of powers provision in
Article 8 of the Maryland Declaration of Rights, we do
recognize as part of the law of this State the doctrine of
executive privilege essentially as set forth in the above-cited
cases.

Like other privileges, whenever a formal claim of
executive privilege is made in litigation, its applicability is
for the court to decide. *United States v. Nixon, supra,* 418
U.S. at 703-705; *United States v. Reynolds, supra,* 345 U.S.

at 8; *Kaiser Aluminum & Chemical Corp. v. United States, supra,* 157 F. Supp. at 947; *Cirale v. 80 Pine Street Corporation, supra,* 359 N.Y.S.2d at 5. However, executive privilege differs from many other evidentiary privileges in some respects. It is for the benefit of the public and not the governmental officials who claim the privilege. *Kaiser Aluminum, supra,* 157 F. Supp. at 944. Apart from diplomatic, military or sensitive security matters,[5] the privilege is not an absolute one. *United States v. Nixon, supra,* 418 U.S. at 705-707; *EPA v. Mink,* 410 U.S. 73, 87, 93 S. Ct. 827, 35 L. Ed. 2d 119 (1973); *Nixon v. Sirica, supra,* 487 F.2d at 715-716; *Committee For Nuclear Responsibility, Inc. v. Seaborg,* 463 F.2d 788, 792, 794 (D.C. Cir. 1971); *Zeiss, supra,* 40 F.R.D. at 327. Rather, it attempts to accommodate the competing interests of a just resolution of legal disputes with the need to protect certain confidential government communications. Nevertheless, when a formal claim of executive privilege is made for confidential communications of the chief executive, or confidential communications of other government officials of an advisory or deliberative nature, there is a presumptive privilege, with the burden upon those seeking to compel disclosure. *United States v. Nixon, supra,* 418 U.S. at 708; *Nixon v. Sirica, supra,* 487 F.2d at 717; *Davis v. Braswell Motor Freight Lines, Inc., supra,* 363 F.2d at 604-605; *Boeing Airplane Company v. Coggeshall, supra,* 280 F.2d at 660; *Zeiss, supra,* 40 F.R.D. at 328-329. And such communications "are 'presumptively privileged,' even from the limited intrusion represented by an *in camera* examination of the conversations by a court." *Senate Select Committee On Pres. Cam. Act. v. Nixon, supra,* 498, F.2d at 730.

The treatment accorded a claim of executive privilege has varied somewhat depending on the circumstances. In many situations the courts have engaged in a balancing process, weighing the need for confidentiality against the litigant's need for disclosure and the impact of nondisclosure upon the fair administration of justice. This has been done where the

---

5. And these matters would not arise frequently with regard to state officials.

564

privilege is asserted for potential evidence at a criminal trial,[6] or where there is an allegation of government misconduct,[7] or where the government itself is a party in the underlying litigation.[8]

In addition, where the confidential communications or documents sought contain factual data, a balancing process may also be utilized. Ordinarily, "memoranda consisting only of compiled factual material or purely factual material contained in deliberative memoranda and severable from its context would generally be available for discovery," *EPA v. Mink, supra,* 410 U.S. at 87-88. *See also Boeing Airplane Company v. Coggeshall, supra,* 280 F.2d at 660-662; *Thill Securities Corp. v. New York Stock Exchange,* 57 F.R.D. 133, 137 (E.D. Wis. 1972); *Zeiss, supra,* 40 F.R.D. at 327; *O'Keefe v. Boeing Company,* 38 F.R.D. 329, 335-336 (S.D.N.Y. 1965). However, material cannot always "easily be separated into fact finding and decision making categories," *Boeing Airplane Company v. Coggeshall, supra,* 280 F.2d at 662. Moreover, some factual material is entitled to a degree of protection under the privilege, although not to the same extent as opinions and recommendations. This

---

6. United States v. Nixon, *supra,* 418 U.S. at 711-713; Nixon v. Sirica, *supra,* 487 F.2d at 717.

7. Zeiss, *supra,* 40 F.R.D. at 329; Rosee v. Board of Trade of City of Chicago, 36 F.R.D. 684, 689-690 (N.D. Ill. 1965); United States v. Procter & Gamble Company, 25 F.R.D. 485, 490 (D.N.J. 1960); Bank of Dearborn v. Saxon, 244 F. Supp. 394, 402-403 (E.D. Mich. 1965), *aff'd,* 377 F.2d 496 (6th Cir. 1967); Kaiser Aluminum & Chemical Corp. v. United States, 157 F. Supp. 939, 947 (Ct. Cls. 1958).

8. Where the government is a party, a question of unfair litigation advantage may arise. In other words, the government may be in a position of asserting or defending a claim while at the same time depriving its opponent of information needed to overcome the government's position. In these circumstances, courts have weighed the government's need for confidentiality against its opponent's need for information. *See, e.g., Zeiss, supra,* 40 F.R.D. at 329, and cases there collected; Olsen v. Camp, 328 F. Supp. 728, 731 (E.D. Mich. 1970); Kaiser Aluminum, *supra,* 157 F. Supp. at 945. *Cf.* Machin v. Zuckert, 316 F.2d 336, 339 (D.C. Cir. 1963), *cert. denied,* 375 U.S. 896, 84 S. Ct. 172, 11 L. Ed. 2d 124 (1963). Of course, in this situation, a determination by a court that the government's need for confidentiality is outweighed by its opponent's need for disclosure, does not absolutely prevent the government from maintaining confidentiality. The government is then left with the choice of either producing the information or having the issue to which the information relates resolved against it. *See, e.g.,* United States v. Reynolds, *supra,* 345 U.S. at 5; Smith v. Schlesinger, 513 F.2d 462, 468 (D.C. Cir. 1975). But where the government is not a party to the underlying litigation, this choice is not open to it.

would include facts obtained upon promises or understandings of confidentiality, investigative facts underlying and intertwined with opinions and advice, and facts the disclosure of which would impinge on the deliberative process. *See, e.g.* (relating to one type or another of such factual material): *EPA v. Mink, supra,* 410 U.S. at 92; *Mead Data Cent., Inc. v. U. S. Dept. of Air Force,* 566 F.2d 242, 256-257, 260 (D.C. Cir. 1977); *Brockway v. Department of Air Force,* 518 F.2d 1184, 1191-1194 (8th Cir. 1975); *Montrose Chemical Corporation of California v. Train,* 491 F.2d 63, 66-71 (D.C. Cir. 1974); *J. H. Rutter Rex Manufacturing Co., Inc. v. N.L.R.B.,* 473 F.2d 223, 234-235 (5th Cir. 1973), *cert. denied,* 414 U.S. 822, 94 S. Ct. 120, 38 L. Ed. 2d 55 (1973); *Freeman v. Seligson,* 405 F.2d 1326, 1339-1340 (D.C. Cir. 1968); *Machin v. Zuckert, supra,* 316 F.2d at 339-340; *Rabbitt v. Department of Air Force,* 401 F. Supp. 1206, 1209 (S.D.N.Y. 1974). In these situations, the government's asserted reasons for nondisclosure are weighed against the litigant's need for discovery in light of the particular circumstances of each case. *Frankenhauser v. Rizzo,* 59 F.R.D. 339, 342-346 (E.D. Pa. 1973); *O'Keefe v. Boeing Company, supra,* 38 F.R.D. at 334-336.

Most cases in which formal claims of executive privilege have been made involved one or more of the above-mentioned situations, and the courts weighed the government's reasons for nondisclosure against the need for discovery, sometimes upholding the claim of privilege in its entirety, sometimes rejecting the claim in its entirety, and sometimes requiring the production of some but not all of the materials sought. However, in cases not falling within one of these categories, the claim of privilege should ordinarily be honored. *Zeiss, supra,* 40 F.R.D. at 329. In other words, where the material sought from the government consists wholly of confidential opinions, deliberations and recommendations for use in civil litigation where the government is not a party, and where there is no charge of misconduct involving the government agency from which production is sought, the material is clearly privileged. As the court stated in *Rosee v. Board of Trade of City of*

*Chicago,* 36 F.R.D. 684, 689 (N.D. Ill. 1965), "the cerebrations and mental processes of government officials, leading to admittedly proper exercises of power, can never be a factor in a judicial proceeding and, therefore, need not be disclosed."

The certified question in this case also encompasses the role of *in camera* inspection by a court when faced with a formal executive privilege claim. It has repeatedly been stated that *in camera* inspection by the trial judge does not automatically follow whenever a claim of executive privilege is made. *United States v. Nixon, supra,* 418 U.S. at 713; *United States v. Reynolds, supra,* 345 U.S. at 10; *Zeiss, supra,* 40 F.R.D. at 331; *Kaiser Aluminum, supra,* 157 F. Supp. at 947-948; *Cirale v. 80 Pine Street Corporation, supra,* 359 N.Y.S.2d at 5-6. As pointed out by some of these courts, the *in camera* inspection itself is an intrusion upon the privilege. Thus, when a formal claim of executive privilege is made, with an affidavit stating that the demanded materials are of a type that fall within the scope of the privilege, they are presumptively privileged even from *in camera* inspection. The burden is on the party seeking production to make a preliminary showing that the communications or documents may not be privileged or, in those cases where a weighing approach is appropriate, that there is some necessity for production. *United States v. Nixon, supra,* 418 U.S. at 713-714; *Senate Select Committee On Pres. Cam. Act. v. Nixon, supra,* 498 F.2d at 730; *Committee For Nuclear Responsibility, Inc. v. Seaborg, supra,* 463 F.2d at 792; *Zeiss, supra,* 40 F.R.D. at 331. Mr. Justice Reed explained for the Court in the *Kaiser Aluminum* case, *supra,* 157 F. Supp. at 947:

"It seems equally obvious that the very purpose of the privilege, the encouragement of open expression of opinion as to governmental policy is somewhat impaired by a requirement to submit the evidence even unilaterally. When the head of an agency claims privilege from discovery on the ground of public interest, which is recognized as a basis for the claim, it seems to us a judicial

examination of the sought-for evidence itself should not be required without a much more definite showing of necessity than appears here."

Consequently, absent such a preliminary showing by the party demanding disclosure, the claim of executive privilege should be honored without requiring an *in camera* inspection.

On the other hand, where a sufficient showing is made to overcome the presumption, the court should order an *in camera* inspection. Depending upon the issues and circumstances, the *in camera* inspection may be utilized to determine whether the material is privileged, to sever privileged from non-privileged material if severability is feasible, and to weigh the government's need for confidentiality against the litigant's need for production.

Applying the above principles to the case at bar does not permit a "Yes" or "No" answer to the second certified question insofar as it asks whether the Wilner Report is barred from discovery on the basis of executive privilege. However, we do believe that an *in camera* inspection of the report by the federal district court would not be inconsistent with the concept of executive privilege which we recognize as part of this State's law.

If the Wilner Report were essentially confined to those matters mentioned in paragraph 8 of the gubernatorial affidavit, namely Judge Wilner's confidential "opinions, recommendations, and deliberations ... for use by the Governor in deciding what executive action, if any, was appropriate," there could be little doubt that, under the previously discussed cases, it would be privileged without any need for an *in camera* inspection. In fact, in his brief before this Court, the plaintiff disclaimed a desire for production of such deliberative material, stating (appellee's brief, p. 13): "[Plaintiff] is willing to forego any advisory opinions or recommendations in that these do not relate to the complaint and in that executive privilege might attach to such material."

Moreover, the mere presence of some factual material in

the demanded document would not necessarily change its privileged status so as to warrant *in camera* inspection. Opinions, advice and recommendations are premised upon or flow from facts. The mere recitation of certain factual understandings or factual conclusions in a document, forming the basis for the opinions and recommendations, would not deprive a document of its essentially deliberative character. *Cf. Boeing Airplane Company v. Coggeshall, supra,* 280 F.2d at 662. Or, if the only severable factual data in the Wilner Report came from medical records at Spring Grove State Hospital, *in camera* inspection would not be justified because the plaintiff can obtain these records directly from the hospital under our holding in Part (1) of this opinion.

The plaintiff, however, asserts that the Wilner Report consists *primarily* of factual rather than deliberative material, including much factual data in addition to Spring Grove State Hospital records. According to the plaintiff, the Wilner Report contains statements of witnesses and psychiatrists, records of Goode's prior arrests, medical and educational records from institutions other than Spring Grove, and conclusions of psychiatrists that the doctors at Spring Grove had "misdiagnosed" Goode.

Furthermore, these are not mere unsupported allegations by the plaintiff. Instead, the record in this case indicates that the Wilner Report may well contain substantial factual information. For example, it reveals that Judge Wilner, in the course of his investigation for the Governor, received Goode's authorization "to inspect, examine, copy and in any way whatsoever to have access to any school, health or other personal records, *wherever situated,* pertaining to me." (Emphasis added.) In the United States District Court and in this Court, the Attorney General of Maryland implicitly acknowledged that the Wilner Report contained substantial factual data concerning Goode. The Attorney General stated that Judge Wilner had extensively gathered information over three months, that all records obtained about Goode were upon the understanding with him that they were to be confidential, and that "almost" all other data was either

obtained on an understanding that it would be confidential or is confidential under federal or state law. The Attorney General argued that this factual data is also protected by executive privilege. If the Wilner Report did not contain factual material concerning Goode, this argument would seem to have been unnecessary.

Finally, the gubernatorial affidavit itself tends to confirm the factual nature of the Wilner Report. Paragraph 3 of the affidavit indicates that the report "contained confidential data concerning Arthur F. Goode, III." Paragraph 4 stated that the information and records "originated in confidence" and that the records were also confidential under federal or state law. Paragraph 7 referred to information in the report "that is highly personal to Mr. Goode and to his family." Paragraph 10 c of the affidavit states that "[r]epresentations were made to sources of information for the report that the data would be held in strictest confidence."

The federal district court in this case might well conclude that under Maryland law, a sufficient showing has been made to overcome the presumptive privilege to the extent of justifying an *in camera* inspection of the Wilner Report.[9] Although, as previously discussed, some factual matter is entitled to protection under executive privilege principles, such as information obtained on the understanding that it would remain confidential and certain investigative information, this matter is not privileged to the same degree as opinions and recommendations, and a weighing approach is often utilized. Furthermore, the court might want to ascertain more precisely the nature of the factual data involved. Some of the records involved may not fall within the category of information obtained on a promise of confidentiality. In addition, some factual matter in the Wilner Report might fall within a similar category to the

---

**9.** It should be kept in mind that we are here responding to a federal court's certified question concerning Maryland law, prior to the federal court's final determination with respect to discovery or *in camera* inspection, and, consequently, without that court's reasons underlying such final determination. This is somewhat different than our review of a state trial court's final decision applying Maryland law to the circumstances of a particular case.

Spring Grove State Hospital records dealt with in Part (1) of this opinion. In other words, although initially obtained under a promise of confidentiality or otherwise privileged under federal or state law, that confidentiality or privilege may have been waived by authorizing a release of the factual data to Mr. Furr in the Baltimore County litigation. In sum, at this stage of the case and in light of the record before us, it would not be inconsistent with Maryland law for the federal district court to require an *in camera* inspection of the Wilner Report.[10]

> *Questions of law answered as herein*
> *set forth.*
> *Costs to abide final result.*

---

**10.** During the oral argument before this Court, there was considerable discussion as to whether the entire claim of executive privilege for the Wilner Report, including the deliberative material, had been waived by certain alleged actions of Judge Wilner and Governor Mandel. Although it is said that executive privilege may be waived, United States v. Reynolds, *supra,* 345 U.S. at 7, there is very little case law in the appellate courts with respect to waiver of an executive privilege claim. Also, as executive privilege is for the benefit of the public and not for the benefit of the particular officials involved, and as the present Governor, Harry R. Hughes, has made a new determination that disclosure of the Wilner Report would not be in the public interest, it might be questioned whether the issue of waiver of the present Governor's executive privilege claim should be determined by the actions of his predecessor and a member of his predecessor's staff.

In any event, we decline to explore further this matter. The plaintiff, rather than relying on waiver, acknowledged in his brief that he did not seek any "advisory opinions or recommendations." In addition, there has been an insufficient factual development concerning these alleged actions of Judge Wilner and Governor Mandel for us to consider any issue of waiver under Maryland law.