603 A.2d 1364

**MARYLAND COMMITTEE AGAINST THE GUN BAN**

v.

**MAYOR & CITY COUNCIL OF BALTIMORE, et al.**

**No. 963, Sept. Term, 1991.**

Court of Special Appeals of Maryland.

April 8, 1992.

Certiorari Granted June 18, 1992.

Howard J. Fezell, Frederick, for appellant.

William R. Phelan, Jr., Sr. Sol. (Neal M. Janey, City Sol. and Frank C. Derr, Principal Counsel, on the brief), Baltimore, for appellees.

Argued Before WILNER, C.J., and GARRITY and BLOOM, JJ.

WILNER, Chief Judge.

One of the more controversial pieces of legislation introduced into the 1988 session of the General Assembly was an Administration Bill (HB 1131) designed to stanch the flow of cheap, low quality, easily concealable handguns on to the streets. It created a Handgun Roster Review Board to develop a roster of guns that fit certain criteria set out in the bill and then prohibited distribution in Maryland of any gun on that roster. When the bill passed (1988 Md. Laws, ch. 533), appellant, as a political committee, spearheaded an effort to refer the measure to the voters (Md. Const., art. XVI) and, after succeeding in that effort, to encourage its defeat. The measure was on the ballot, as Question 3, in the general election of November 8, 1988. It attracted a great deal of publicity and attention.

On the evening of November 7, a number of Baltimore City police officers came to appellant's campaign headquarters at 2506 N. Calvert Street in order to serve a subpoena that had been issued that day by the State's Attorney for Baltimore City. Although the subpoena itself is not in the record, it appears that the State's Attorney was looking for evidence that might show whether appellant was violating the State election laws by paying "walking around" money. According to one Ed Rothstein, who was present at the time, three officers appeared and asked that everyone in the three-story building assemble on the first floor. No one was permitted to leave the building. One of the officers, whom Mr. Rothstein identified as Detective

Gundy, was particularly abusive, shouting orders and using a great deal of profanity.

Stephen Miller and Francine Cornish, who worked for appellant, arrived after the employees—about 40 of them—had been herded on to the first floor. Some of them complained about being prevented from going to the bathroom. Sgt. France identified himself, produced the subpoena, and asked for the documents. When Mr. Miller denied that the documents he sought existed, the police began entering the various offices, going through desks and files, and, according to Miller and Cornish, placing records and documents, indiscriminately, into boxes. Miller confirmed Mr. Rothstein's report of threats, abusive language, and profanity on the part of Detective Gundy as well as being pushed by him. Mr. Miller did succeed in persuading Sgt. France to allow people to go to the bathroom and, provided they took no documents with them, to leave the building.

Appellant's chairman, Fred Grüisser, arrived from Laurel between 8:00 and 8:30 and was informed by his staff that the officers were "tearing the place apart" and "pulling files out." In subsequent testimony, he stated that the phone banks, through which staff people were calling voters to urge them to vote the next day, "were shut down completely" because "when the police came they shut the whole operation down." Shortly after his arrival, Mr. Grüisser spoke with Sgt. France, who seemed to be in charge. Sgt. France informed Mr. Grüisser that the items he was looking for did not seem to be on the premises and that the police would be leaving, as indeed they did. It is not clear whether they took any of appellant's records with them or, if so, what they took.

Within a few weeks after this incursion, the Internal Investigation Division of the Baltimore City Police Department (IID) commenced an investigation of the event, apparently upon complaints filed by Mr. Grüisser and one or more other persons. In the course of it, detectives interviewed and took recorded statements from a number of people, including Messrs. Grüisser, Rothstein, and Miller and Ms.

Cornish. We are informed that the investigation was completed in the spring of 1989 and that no action was taken as a result of it. Insofar as the Police Department is concerned, the matter was closed at that time.

On May 31, 1990, appellant filed a request under the State Freedom of Information Act (Md.Code State Gov't art., §§ 10–611–10–628) to inspect and obtain copies of the report prepared by IID as well as "any notes taken by [the two officers who conducted the investigation] while gathering information for the report, any written or recorded statements taken from the officers involved or any witnesses, and any reports prepared by the officers involved concerning their entry into our headquarters on November 7, 1988." Through Major Kenneth Blackwell, director of IID, the department denied the request on the grounds that the records sought (1) constituted "inter-agency, intra-agency documents" containing "pre-decisional records, created solely for use by this agency," and thus were non-disclosable under State Gov't art., § 10–618(b), (2) constituted "records of an investigation compiled for a law enforcement purpose," and were thus non-disclosable under § 10–618(f), and (3) contained "personal records," and were non-disclosable under §§ 10–624 and 10–626.

Faced with this denial, appellant filed a complaint in the Circuit Court for Anne Arundel County seeking an order requiring the department to produce the requested documents. *See* § 10–623. After an evidentiary trial, consisting principally of the testimony of Major Blackwell and Mr. Griisser and the recorded statements given to IID by Griisser, Rothstein, Miller and Cornish, which had eventually been released to them by IID, the court entered an order on April 30, 1991, declaring that the department was not required to release the requested documents. This appeal ensued.

### *Statutory Framework and Conclusions of the Circuit Court*

The General Assembly has stated rather clearly its purpose in enacting the Freedom of Information Act. In § 10–

612 of the State Government article, it declared that "[a]ll persons are entitled to have access to information about the affairs of government and the official acts of public officials and employees" and that, "unless an unwarranted invasion of the privacy of a person in interest would result," the Act "shall be construed in favor of permitting inspection of a public record, with the least cost and least delay to the person ... that requests the inspection." Section 10–613 adds the command that, "[e]xcept as otherwise provided by law, a custodian shall permit a person ... to inspect any public record at any reasonable time."

The phrase "except as otherwise provided by law" implicates §§ 10–615 through 10–619, which set forth lists of circumstances under which access may be denied or restricted, and § 10–626, which prohibits the unlawful disclosure of personal records. We are concerned here only with § 10–618, and, in particular, subsections (a), (b), and (f) thereof. No claim has been made by the department in this appeal that the records sought by appellant may be shielded under any other section; nor did the court below find any other safe harbor for them.[1]

Section 10–618(a) states that, "[u]nless otherwise provided by law, if a custodian believes that inspection of a part of a public record by the applicant would be contrary to the public interest," he may deny inspection "as provided in this section." Subsection (b) permits a custodian to deny inspection "of any part of an interagency or intra-agency letter or memorandum that would not be available by law to a private party in litigation with the unit."

Section 10–618(f)(1) provides, in relevant part, that, "[s]ubject to paragraph (2) of this subsection," a custodian may deny inspection of records of investigations conducted by a police department. Paragraph (2) states, however,

---

1. Although, as noted, the department asserted in the Circuit Court that the report contained personal records non-disclosable under § 10–626, the court did not reach that issue, and it has not been pressed in this appeal.

that a custodian may deny inspection "by a person in interest" only to the extent that the inspection would:

"(i) interfere with a valid and proper law enforcement proceeding;

(ii) deprive another person of a right to a fair trial or an impartial adjudication;

(iii) constitute an unwarranted invasion of personal privacy;

(iv) disclose the identity of a confidential source;

(v) disclose an investigative technique or procedure;

(vi) prejudice an investigation; or

(vii) endanger the life or physical safety of an individual."

As noted, appellant's request for inspection specified not only the IID report itself but also various categories of supporting documents. A comparable request was made in the complaint filed in the Circuit Court. At the commencement of the hearing, however, the department asserted that the documents in question were all part of one investigatory file, and so the court and the parties thereafter spoke in terms of one document, meaning the IID file or report.

Major Blackwell testified that, when a complaint is made against a departmental officer or employee, a detective from IID contacts the complaining party and gathers "other pertinent documentation that might lend itself to rounding out the investigation. That might include reports generated by the particular accused member, as well as particular logs indicating what officers were on the scene and, so on and so forth." When all of the information is put together, the investigator records his opinion as to "what finding we might render in this particular case." The report—the factual material and the detective's opinion—is then passed up a chain of command, from the detective to a sergeant, then to a lieutenant, then to an administrative review sergeant, then to Major Blackwell, and finally to a deputy commissioner. As Blackwell described the process, "[e]ach of those individuals [is] reviewing the report to make certain that all the things that should have been done were

done. If not, they offer certain opinions or suggestions as to what ought to be done to make this a full and impartial investigation."

The report is prepared in duplicate. The first major part of it is a summary of the investigation. This consists of a "synopsis of the investigative steps setting forth facts and testimony of complainant, accused and all pertinent witnesses directly related to the complaint...." Following this, but still as part of the summary, is "a conclusion comprised of a weighted evaluation of the evidence on both sides and the finding of the case." The next major part deals with the complainant and includes a "detailed account of the complaint, usually a narrative exposition, followed by interrogatories." There follow "[s]tatements of witnesses which generally support the complainant" and "[o]ther pertinent documents bearing upon the allegation, e.g., neighborhood canvasses." Next comes all reporting by the accused officer not found elsewhere, "[s]tatements of witnesses generally in support of the accused," and "[o]ther pertinent documents bearing upon these witnesses." Finally, in terms of factual material, the report must contain statements or reports from witnessing police officers or employees, communications transcripts, and "[a]ny other reporting associated with the case not found elsewhere...."

After conducting an *in camera* inspection of the report, the court drew two principal conclusions. First, it declared that the report was an intra-agency document because it never left IID, adding then that:

> "Additionally, the document would not be available by law to a private party in litigation with the unit. Throughout the document the investigator's and reviewer's opinions and conclusions are interspersed with the factual details. Thus, the document constitutes work-product from the standpoint of [IID] and is not discoverable."

The court did not elucidate on just how or to what extent the investigator's or reviewer's opinions were interspersed with factual details. Having concluded that it fell within

the "intra-agency exception" (§ 10–618(b)), the court considered whether its disclosure to appellant would be contrary to the public interest (§ 10–618(a)). It found:

"The purpose of the investigation was to determine if officers of the Baltimore City Police Department acted improperly, with regard to departmental standards, on the evening of November 7, 1988, while they were on the premises of Plaintiff. In order to conduct such an investigation, confidentiality of any person who cooperates with the investigation must be assured. If confidentiality were not maintained, witnesses or other persons with information would be hesitant to cooperate because of a fear of retribution or possible wrongdoing by the officer being investigated. If all [IID] investigations were released to the public, it would be extremely difficult to discipline or remove officers who were acting improperly. Clearly it is in the public interest to discipline police officers who act contrary to departmental regulations. Therefore, the court finds that the disclosure of the documents would be contrary to public interest."

As an additional, alternative basis for affirming the department's position, the court found that the report fell within the "investigation exception" of § 10–618(f). After declaring that it was the record of an investigation by the police department and, with the conditions stated in subsection (f)(2) apparently in mind, the court stated:

"Additionally, inspection of the document may disclose the identity of a confidential source. More importantly, the release of the document would constitute an unwarranted invasion of personal privacy with respect to the officers who were investigated (and subsequently exonerated)."

We shall deal with these two principal conclusions separately.

### Intra–Agency Memorandum

The Court of Appeals discussed the interagency and intra-agency exemptions, as set forth in the Maryland Act, in

*Cranford v. Montgomery County,* 300 Md. 759, 481 A.2d 221 (1984). To be exempt, the record must first constitute a "memorandum" of that type. We shall assume, without deciding, that the report satisfies that test.[2] That alone does not suffice, however, for, as the *Cranford* Court pointed out at 772, 481 A.2d 221, status of the document as an interagency or intra-agency memorandum is but one of three elements that must be considered; the memorandum is not exempt under § 10–618(b) unless two other tests, or restrictions, are also satisfied:

"The second element restricts the exemption. A document may be an agency memorandum *but, if it is available by law to a private party in litigation with the agency, it is to be produced.* The third element is a further restriction. Although a document meets the first two requirements, withholding it might serve no public

---

2. In *Cranford,* the Court noted that the analogous exemption in the Federal Freedom of Information Act embraced a number of privileges, the broadest of which was sometimes referred to as the "deliberative process," "executive," "pre-decisional," or "staff" privileges, that, by whatever name, it was designed to protect the "decision making processes of government agencies," and that the same policy underlies the executive privilege of Maryland evidence law, as articulated in *Hamilton, Superintendent v. Verdow,* 287 Md. 544, 414 A.2d 914 (1980). In *Hamilton,* again using Federal decisions as a base, the Court observed that executive privilege was based on the "valid need for protection of communications between *high* Government officials and those who advise and assist them in the performance of their manifold duties...." *Id.* at 558, 414 A.2d 914, quoting from *United States v. Nixon,* 418 U.S. 683, 705, 94 S.Ct. 3090, 3106, 41 L.Ed.2d 1039 (1974) (emphasis added).

The department urges that the report constitutes a "memorandum" because it records a "deliberative process" and that it is intra-agency because it never left the possession of IID. This raises the issue whether, by quoting from cases such as *Nixon,* the *Hamilton* Court intended to restrict the scope of executive privilege to communications to or between "high" government officials, which might exclude reports prepared for police sergeants or lieutenants, and whether, by referring to *Hamilton,* the *Cranford* Court intended to restrict the definition of "memorandum" for purposes of the Freedom of Information Act to those communications that would be subject to the executive privilege.

Those are questions that may some day need to be resolved, but, for reasons we shall shortly explain, that day is not yet upon us.

interest so that it is to be produced. For example, the document may relate to agency action taken so long ago that disclosing it no longer makes any difference."
(Emphasis added.)

As we observed, although the lower court held that the report would not be available to a private party in litigation with the department, it seemed to base that conclusion on the notion that the report contained reviewers' opinions and thus would constitute work product from the standpoint of IID.

In examining that question, we must first consider, as the *Cranford* Court did, what type of litigation the restriction assumes. Under the circumstances here, there might be several hypothetical suits—by appellant against the department or its employees for trespass, for violating appellant's rights under the Fourth Amendment, or for interfering with its First and Fourteenth Amendment rights to free speech and to engage in political activity, by appellant's employees for false imprisonment, and at least in one case by one of appellant's employees for assault and battery. At least to the extent it contains descriptions of what brought the police to appellant's headquarters and what occurred there, the report surely would be relevant in any such suit and would therefore be facially subject to discovery under Md. Rule 2–402.

There is, to be sure, a limited protection for what has become known as "work product." Md.Rule 2–402(c) states that a party may obtain discovery of documents

"prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including an attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the materials are discoverable under section (a) of this Rule and that the party seeking discovery has substantial need for the materials in the preparation of the case and is unable without undue hardship to obtain the substantial equivalent of the materials by other means."

This Rule, as its plain language establishes, does not shield these kinds of documents entirely from an adverse party; it simply requires a showing of special need in order to obtain access to them.

The most obvious deficiency in the court's conclusion that the report would not be available in private litigation with the department is that there is absolutely no evidence in this record that the IID report was prepared "in anticipation of litigation or for trial." That alone removes it from the limited protection of Rule 2–402(c). Because the report would be relevant in the hypothetical litigation and because it would not be excludable as a report prepared in anticipation of litigation, it would be available to a private party in litigation with the unit.[3] Because the memorandum does not satisfy this second element spoken of by the *Cranford* Court, access to it cannot be denied under § 10–618(b). We need not address, therefore, the third element of whether denying access would serve any public interest.

### Record of Investigation

As noted, § 10–618(f) permits a custodian to deny access to the record of an investigation conducted by a police department, provided that, if the one seeking access is "a person in interest," access may be denied only if one or more of seven enumerated circumstances exist. The lower court never addressed whether appellant was "a person in interest" but apparently assumed that it was, as it rested its decision on findings that several of the circumstances existed. Appellant urges that those findings were unsupported by substantial evidence and indeed fly in the face of the uncontradicted evidence.

-------

**3.** It is possible that disclosure of parts of the IID report might be denied or limited through a protective order entered under Md. Rule 2–403, depending on the nature of the lawsuit and the specific material sought to be protected. There is nothing in this record to suggest that the department would be *entitled* to such a protective order, however, or, if one were called for, what parts of the report it would shield.

■ Preliminarily, although not considered by the Circuit Court, the department urges that appellant is not a "person in interest" for purposes of § 10–618(f)(2) and that the restrictions on denial of access listed in that subsection therefore do not apply. The department takes the position that the only people who qualify as "persons in interest" under that subsection are the police officers or employees against whom a complaint was made and who are or were the subject of the IID investigation. No authority is cited for that proposition.

The term "person in interest" is defined, for purposes of the Act, in § 10–611(e) as including "a person or governmental unit that is the subject of a public record or a designee of the person or governmental unit." To some extent, that definition just begs the question by placing into issue who is "the subject of" the IID report. As with any statutory term, courts must look ultimately to the purpose of the statutory provision—what goal the legislature was trying to achieve. *Kaczorowski v. City of Baltimore,* 309 Md. 505, 525 A.2d 628 (1987). Certainly, as the department contends, the officers whose conduct was being investigated are the subjects of the report and thus are interested persons. But there is no indication, either in the definition or in the statute generally, that there cannot be more than one category of "subject" or "interested person."

It appears from the General Order of the department (No. 48–77), under which IID investigations are authorized and conducted, that those investigations are usually triggered by a complaint that someone makes about the conduct of an officer or employee; that, it appears, was the case here. Charges of police misconduct are obviously of public concern and of concern to the department, but they are, in addition, of particular concern to the person against whom the conduct was directed or who may have been harmed by it, and, although there are other State and Federal agencies capable of investigating such conduct, the IID investigation is usually the most routine official response and may, as apparently in this case, be the only official response.

The focus of the IID investigation was on what occurred at appellant's headquarters. Major Blackwell acknowledged in his testimony that two officers were accused of impropriety, that the alleged impropriety occurred at appellant's headquarters, and that it was directed against people working there at the time. The record indicates that the police were there to serve and execute a subpoena *duces tecum* and that the search through desks and files and some of the allegedly abusive conduct and obscene language did not commence until appellant's employees refused to turn over the records called for in the subpoena, asserting that they did not exist. It is evident, then, that the conduct of the police was, to some extent at least, a response to the conduct and statements of appellant and its employees. In that circumstance, we would be hard-pressed to conclude that appellant, through its employees, was not also "the subject" of the investigation and the report. We therefore conclude that appellant *is* a person in interest within the meaning of § 10–611(e) and § 10–618(f)(2).

■ This takes us, then, to the seven circumstances enumerated in § 10–618(f)(2) that would justify non-disclosure, and, as to them, we are at a loss to understand how the court could have rationally arrived at its announced findings, for there was no evidence whatever to support them. This investigation had been concluded without further action at least a year before the request for access to the report was made, and so there was no investigation to be prejudiced by disclosure ((f)(2)(vi)). The department, through counsel, conceded at Major Blackwell's deposition that there was no law enforcement proceeding with which disclosure could interfere ((f)(2)(i)). The department also stipulated that, to its knowledge, there was no impending trial or adjudication which disclosure could prejudice (f)(2)(ii) and that disclosure would not cause danger to or imperil the life or safety of any individual ((f)(2)(vii)). Major Blackwell conceded that no anonymous sources were used in the

investigation, and so disclosure would not reveal the identity of a confidential source ((f)(2)(iv)).

The nub of the department's reliance on subsection (f) seemed to be the concern that, if confidentiality of IID investigations could not be assured, people would be reluctant to cooperate with the investigators and provide information.[4] To some extent, that implicates subsection (f)(2)(iii) and (v)—unwarranted invasion of personal privacy and disclosure of an investigative technique or procedure. The problem as to the first of these is that there was not even a suggestion, much less evidence, that disclosure of *this* report would invade anyone's personal privacy. The department seems to argue that, because some reports contain personal information that needs to be protected, it is necessary to shield *all* IID reports. But the law does not allow such generic, sweeping protection. It looks to the nature of the individual records actually sought, not that of other records compiled under different circumstances. With respect to subsection (f)(2)(v), again, the department produced no evidence that disclosure of the report would reveal an investigative technique or procedure. Indeed, through Major Blackwell's testimony and the admission into evidence of General Order 48–77, the investigative techniques and procedures used in compiling this report were fully explained.

For these reasons, we conclude that the court erred in finding that non-disclosure could be based on § 10–618(f). That, of course, leads us to the final conclusion that there is *no* statutory basis for denying access to the report.

---

**4.** In attempting to wrap IID reports entirely with a cloak of confidentiality, the department overlooks Md.Code art. 27, § 728(b)(5), which is part of the Law Enforcement Officers Bill of Rights. That section requires that the accused officer be furnished with a copy of the investigatory file and any exculpatory information, excluding only the identity of confidential sources, non-exculpatory information, and recommendations as to charges, disposition, or punishment. Although these are broad exceptions, it does appear that some parts of the IID file must be turned over to the officer, and, to that extent, total confidentiality cannot be assured.

JUDGMENT REVERSED; CASE REMANDED TO CIRCUIT COURT FOR ANNE ARUNDEL COUNTY FOR ENTRY OF ORDER REQUIRING PRODUCTION OF IID REPORT; MAYOR AND CITY COUNCIL OF BALTIMORE TO PAY THE COSTS.