854 A.2d 1220

STROMBERG METAL WORKS, INC.

v.

UNIVERSITY OF MARYLAND, et al.

No. 122, Sept. Term, 2003.

Court of Appeals of Maryland.

July 27, 2004.

152

John H. Michel (Kenneth K. Sorteberg, Huddles & Jones, P.C., Columbia, on brief), for appellant.

Dana A. Reed, Asst. Atty. Gen. (J. Joseph Curran, Atty. Gen., on brief), for appellees.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA, GREENE, JJ.

WILNER, J.

Appellant, Stromberg Metal Works, Inc., a subcontractor on a construction project at the College Park Campus of the University of Maryland (UMCP), filed a request under the Maryland Public Information Act (PIA) to inspect and copy certain public records pertaining to the project. The University turned over some of the records that were requested but redacted certain information in others, claiming that the information was privileged and therefore not subject to disclosure. Stromberg filed suit under the Act to obtain the information.

Obviously crediting the University's assertion that the requested information was privileged, the Circuit Court for Prince George's County entered summary judgment in favor of the University, and Stromberg appealed. We granted *certiorari* on our own initiative, prior to proceedings in the

Court of Special Appeals, and shall affirm in part and reverse in part.

## BACKGROUND

The project in question is the renovation of the Adele H. Stamp Student Union at the College Park Campus. The general contractor for the job was Grunley Construction Co. Inc. Grunley subcontracted certain mechanical work to John J. Kirlin, Inc., which, in turn, subcontracted the fabrication and installation of ductwork to Stromberg. The project had initially been budgeted at $39.3 million, but that budget was increased to $44.9 million by August, 2001.[1] Construction began in July, 1999, and was due to be completed in September, 2002. As of December, 2001, the project was running more than $2 million over the then-effective budget amount and was 53 weeks behind schedule.

Apparently concerned whether there was adequate funding to complete the project, Stromberg, invoking the PIA, made requests for various documents pertaining to the project on November 29, 2000, August 9, 2001, and September 28, 2001. Among the documents requested were monthly reports prepared by the University's Department of Architecture, Engineering and Construction with respect to the project (AEC Reports). The AEC Reports were prepared by John Mitchell, an employee in the AEC Department and project manager for the project. He and Joyce Hinkle, a procurement employee in the Department of Procurement and Supply, were the custodians of the reports.

The AEC Report is in the form of two spread sheets detailing certain information about all of the University's ongoing construction projects and one spread sheet for each project that contains additional information regarding that project. The individual project report for the Stamp project shows such things as (1) the original funding authorization and budget for planning, construction, equipment, and other items,

---

1. By September, 2002, the budget had been increased to $48.5 million.

(2) approved funding and budget changes, (3) the current funding and budget for each category of expense, (4) the amount of the budget that is encumbered and liquidated to date, (5) the estimated amount needed to complete the project, (6) the final cost forecast, (7) any budget variance, and (8) the target and actual dates of the start of construction, substantial completion, and project completion. One of the consolidated spread sheets shows the projected budget for the project, the final cost forecast, the amount and percentage that the project is under or over budget, and how many weeks the project is behind or ahead of schedule.

After a review of the requested documents by the Attorney General's Office for any privileged material, the University made the documents available in January, 2002. Among the documents turned over for inspection were unredacted copies of the AEC Reports, including the latest Report, for December, 2001. Stromberg requested copies of some of the documents, including the AEC Report for December, 2001; they were delivered a week later. The inspection and copying were supervised by the Attorney General's Office.

On August 14, 2002—some eight months later—Stromberg filed a supplemental application for additional documents, including the monthly AEC Reports for and after January, 2002. The application was sent to Jennifer Forrence, the Assistant Attorney General who had supervised the disclosure of the first round of requested documents, and John Mitchell.

The PIA requires the custodian of public records to grant or deny an application within 30 days after receiving it. *See* Maryland Code, § 10–614(b) of the State Government Article (SG). On September 13, 2002, another Assistant Attorney General, David Chaisson, responded that the University was gathering the documents but would need additional time to gather them all. The parties agreed to a 30–day extension for production of the documents. On October 2, 2002, Mr. Chaisson advised that the documents were ready for inspection, and that the University was entitled to $1,750 for its search and

production efforts. A check for that amount was promptly sent to the University.

Inspection occurred on October 8, but a number of documents, including the requested monthly AEC Reports for January—September, 2002, were not produced. In response to Stromberg's complaint about the missing AEC Reports, Mr. Chaisson wrote, on October 16, 2002, that "[s]ome of the information provided in those reports *is privileged under the executive privilege* and, as well, *may* contain *confidential commercial financial information.*" Chaisson added that, to the extent the reports contained privileged information, they would be produced in a redacted form.

The next day, the University turned over copies of the AEC Reports from which a great deal of information had been redacted. On the reports pertaining to the Stamp Project, in particular, the dollar amounts for the estimated cost to complete the project, the final cost forecast, the estimated budget variance, forecasted surplus or shortfall, and the current percentage of completion were redacted. On the consolidated reports, the only information supplied was the projected budget for the Stamp Project and the number of days and weeks that project was behind schedule. All information relating to the other projects was redacted, apparently without objection.

In November, 2002, Stromberg filed this action to enjoin the University, Mitchell, and Hinkle from withholding the requested information, to permit Stromberg to inspect the monthly AEC Reports, and for ancillary relief. In its answer to the complaint, the University admitted or denied various factual allegations but asserted no particular basis for withholding the information. Its defense was presented in a memorandum filed in support of its motion for summary judgment, in which it asserted that the redacted information was protected by "executive privilege" and by the University's privilege for "confidential commercial information." The University relied on two provisions of the PIA—SG §§ 10–615(1) and 10–618(b).

Section 10–615(1) *requires* a custodian to deny inspection of a public record or any part of a public record if, "by law, the

public record is privileged or confidential." Section 10–618(b) *permits* a custodian to deny inspection of "any part of an interagency or intra-agency letter or memorandum that would not be available by law to a private party in litigation with the [governmental] unit." As to both sections, the University claimed that the redacted information was "protected by executive privilege," citing as authority *Hamilton v. Verdow*, 287 Md. 544, 414 A.2d 914 (1980), *Office of the Governor v. Washington Post*, 360 Md. 520, 759 A.2d 249 (2000), and *Cranford v. Montgomery County*, 300 Md. 759, 481 A.2d 221 (1984).

In its argument, the University treated "executive privilege" as if it were the same defense or doctrine as "the deliberative process privilege" recognized under the Federal Freedom of Information Act (FOIA), 5 U.S.C. § 552(b)(5). In that regard, it averred that the redacted number for the forecast of final cost was not just a "simple number" but instead represented Mitchell's "subjective assessment of the potential final cost to the University for the project, including the project manager's assessment of the University's potential liability for claims filed by the contractor, for problems on the project that the manager believes may result in claims, and for actual and potential change order requests." That information, it contended, was provided to Mitchell's supervisor, Carlo Colella, so that he could make decisions regarding the amount of resources to devote to the project and whether additional funding might be required, and an assessment of the value of pending claims. The University did not indicate what, if any, authority Mr. Colella had to make or implement any of those decisions or, if he did not have that authority, who did.

In addition to the executive/deliberative process privilege, the University claimed that the redacted information also constituted "confidential commercial information," which it said was privileged under SG § 10–618(b). For that proposition, it relied on a number of Federal cases arising under the FOIA, 5 U.S.C. § 552(b)(5)—the Federal analog to § 10–618(b).

After hearing argument on the cross-motions, the court entered a brief order granting the University's motion, denying Stromberg's motion, and entering judgment for the University. No reasons or findings were included in the order.

## DISCUSSION

### Preliminary Issues

As noted, a great deal of information was redacted from the AEC Reports. The focus of this appeal, however, has been on the one number for the total forecasted cost of the Stamp project. Although, in their briefs and oral argument, the parties sometime spoke of the redacted information generally, their arguments addressed only that one piece of information. Stromberg states as its position "that the nature of the redacted data—numbers representing the total cost of a public construction project—is such that UMCP's claimed privileges do not attach." The arguments, pro and con, focus on that one number in the various reports. Accordingly, we have no basis upon which to disturb the Circuit Court's ruling with respect to the other redacted information and shall consider only the one item that seems still to be in contention.

The predominant question in this appeal is the substantive one of whether the number on the AEC Reports for total cost of the Stamp project is subject to the asserted privileges and, for that reason, is exempt from disclosure. Stromberg has raised a collateral ground for denying the University's right to assert those privileges, however—that of timeliness in asserting them—which we shall consider preliminarily.

Stromberg made its application for disclosure of the documents at issue here on August 14, 2002. SG § 10–614(b)(1) requires that the custodian either grant or deny an application promptly but, in any event, within 30 days after receiving the application. Section 10–614(b)(4) provides that, with the consent of the applicant, that time limit may be extended "for not more than 30 days." Section 10–614(b)(3) requires a custodian who denies an application to notify the applicant immediately

and, within 10 working days, to give the applicant a written statement of the reasons and legal authority for the denial.

As noted, Stromberg consented to a 30–day extension of the initial 30–day period, which would have required the University to grant or deny the application by October 13, 2002—60 days after the August 14 application. Although the AEC Reports were not delivered with the other records on October 8, the University did not notify Stromberg of its intention to redact portions of the AEC Reports until October 16, 2002, three days past the deadline. Stromberg argues that the executive privilege claim was thus untimely and should be barred. We reject that argument, for two reasons.

■ First, it is not at all clear that the University missed the deadline. It had until October 13 to comply with or reject the request and, to the extent it rejected the request, ten additional days to inform Stromberg in writing of the rejection and the reasons for it. The actual rejection, at least implicitly, occurred on October 8, when the AEC Reports were not turned over with the other records that had been requested. Chaisson gave written notice of the final rejection with respect to the redacted information on October 16, well within the ten days allowed by the statute.

■ Second, although the PIA sets time limits on a response by the Governmental unit, it says nothing expressly about the effect of non-compliance with those limits. The essence of Stromberg's position is that, if the unit fails to deny the application within the prescribed time, it is not permitted to deny the application thereafter and must therefore disclose even records or parts of records that the law otherwise either requires or permits the custodian to shield. We are unwilling to interpret the statute in that manner, as we do not believe that the Legislature could possibly have intended such a result.

The time limits are important. In SG § 10–612, the General Assembly expressed the view that all persons are entitled to have access to information about the affairs of Government and the official acts of Government officials and that the

statute should be construed "in favor of permitting inspection of a public record, with the least cost *and least delay* to the person or governmental unit that requests the inspection." (Emphasis added).

The time limits are enforceable in a number of ways under the statute. SG § 10–623 permits a person who is denied inspection of a public record to file an action in court and authorizes the court, in an expedited manner, (1) to order production of the record, (2) to assess damages against any custodian who knowingly and willfully failed to disclose the record, and (3) to assess reasonable counsel fees and other litigation costs against the Governmental unit. If the court finds that the custodian acted arbitrarily or capriciously in withholding the document, the court must send a certified copy of its finding to the appointing authority of the custodian, which may then take disciplinary action against the custodian. Failure to permit inspection of a document subject to inspection within the prescribed time period obviously constitutes at least a temporary denial of inspection, which, unless authorized under the PIA (*see* SG § 10–619), may justify immediate invocation of the judicial remedy. Section 10–627 also makes a knowing and willful violation of the statute a criminal offense. Given these various remedies for withholding records that are disclosable under the statute, requiring the disclosure of non-disclosable records is not necessary as an enforcement mechanism.

■ Apart from the lack of necessity, forcing a unit to permit inspection of records that the statute requires or permits the custodian to shield, simply because of a failure to meet the statutory deadline for denying inspection, is not a reasonable construction of the statute and is not a construction that the Legislature likely intended. The presumption of the statute is in favor of disclosure. *See Governor v. Washington Post, supra,* 360 Md. 520, 544–45, 759 A.2d 249, 262–63. The Legislature carefully carved out for non-disclosure only those kinds or categories of records for which it necessarily found some supervening public policy that justified their shielding.

Indeed, in SG § 10–626, it created civil liability on the part of any individual who knowingly and willfully permits inspection of a public record in violation of the statute, and in § 10–627, it provided a criminal penalty for that conduct as well. We cannot conceive that the Legislature would have contemplated, much less desired, that the public policy justifying the shielding of specific kinds of records be subordinated to the mere failure of a custodian to act within the statutory time limits—that the custodian be required to disgorge records that the Legislature has declared should not be disclosed simply because the custodian did not communicate his/her decision in a timely manner.[2]

### *Executive/Deliberative Process Privilege*

The term "executive privilege," used by the University to justify its redaction of the forecasted final cost number on the AEC Reports, is a broad and ill-defined term that encompasses a number of more specific privileges. It reaches public attention most dramatically when invoked to shield records made in connection with the deliberative decision-making process used by chief or high Executive officials—Presidents, Governors, and their immediate advisors—and, as both the Supreme Court and this Court have pointed out, when applied

---

2. Stromberg also stresses that, in response to its earlier applications, the University supplied unredacted copies of the monthly AEC Reports and thus disclosed the very information, as contained on those reports, that it now claims is privileged and either mandatorily or permissively non-disclosable. The release of that information, Stromberg contends, was not accidental or inadvertent, but was done deliberately after careful review by the Attorney General's Office. Indeed, the University charged Stromberg $4,350 for the collection of the documents that it released for inspection. Despite multiple opportunities during that process, the University never asserted any privilege with respect to the pre-January, 2002 AEC Reports. In the section of its brief that deals with that point, Stromberg argues only that the prior release of the same information demonstrates the non-privileged nature of the information, which goes to the substantive question of whether a privilege applies. We do not construe that argument as one of waiver—that by releasing comparable information in response to the earlier requests, the University has waived its right to claim that the material it redacted in response to the later application is privileged.

in that context, the deliberative process privilege subsumed within that term has its roots in the Constitutional doctrine of separation of powers. *See United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *Cheney v. U.S. District Court*, —— U.S. ——, 124 S.Ct. 2576, 159 L.Ed.2d 459 (2004); and *Hamilton v. Verdow, supra*, 287 Md. 544, 553, n. 3, 414 A.2d 914, 920 n. 3. The term "executive privilege" has also been used as the umbrella for shielding diplomatic, military, and security-laden secrets that may not involve those officials. It is those kinds of executive privilege that are encompassed within SG § 10–615(1)—the Constitutionally-based privilege that, when invoked, must be given the most serious attention and, when properly invoked by the person holding the privilege, require the custodian to deny inspection. It is, after all, not unusual for the physical custodian of the record to be someone other than the person holding the privilege, and it cannot have been the legislative intent—even if the legislature were competent to do it—to permit the custodian to waive or ignore another's Constitutionally based privilege.

We are not dealing here with that form of executive privilege. The records at issue do not contain any diplomatic, military, or security secrets and do not involve the deliberative process of the President or Governor. They were prepared by John Mitchell, the Stamp project manager who worked in the University's Department of Architecture, Engineering & Construction (AEC). Mr. Mitchell prepared the reports for his immediate supervisor, Carlo Colella, the Director of AEC. Colella, in turn, reported to J. Frank Brewer, Associate Vice President for Facilities Management, who reported to another Associate Vice President. That Associate Vice President reported to John D. Porcari, Vice President of UMCP. Mr. Porcari reported to UMCP President C. Daniel Mote, Jr., who reported to Donald N. Langenberg, Chancellor of the University, who reported to the Board of Regents of the University. Mr. Colella claimed, in an affidavit, that he used the total forecasted cost figure supplied by Mr. Mitchell "to make a number of different decisions regarding the projects," includ-

ing "decisions about the amount of resources (financial and human) to commit to each project, whether or not additional funding should be requested for the project from the University Board of Regents, and about the likely value of outstanding claims which are pending from contractors."

■ It is evident that Mr. Colella's decision-making process, which was the sole basis for the asserted privilege, was seven rungs down in the chain of command and responsibility within one State agency. There is nothing in the record before us to indicate that Colella had authority, on his own, to make any decisions regarding additional funding or other resources or regarding the payment of disputed claims; nor is there anything in the record to indicate that the AEC Reports that Mitchell prepared for Colella's benefit were used, or even seen, by anyone up the line for their decision-making. The Constitutional underpinning of any executive/deliberative process privilege on Mr. Colella's part, if it exists at all, is exceedingly remote and tenuous. We find no basis, therefore, for a mandatory denial under SG § 10–615(1).

What is really at issue here is the broader deliberative process privilege that arose from the common law, from rules of evidence, and mostly from rules governing discovery in civil judicial proceedings—a privilege that, with the advent of disclosure statutes, was incorporated into exemption provisions like SG § 10–618(b) and 5 U.S.C. § 552(b)(5), to protect from legislatively mandated disclosure interagency or intra-agency memoranda or letters that would not be available by law to a private party in litigation with the unit. *See EPA v. Mink,* 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973); *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 148–49, 95 S.Ct. 1504, 1515–16, 44 L.Ed.2d 29, 46–47 (1975); *FTC v. Grolier,* 462 U.S. 19, 103 S.Ct. 2209, 76 L.Ed.2d 387 (1983); *Cranford v. Montgomery County, supra,* 300 Md. 759, 481 A.2d 221. *See,* however, *Federal Open Market Committee v. Merrill,* 443 U.S. 340, 354–55, 99 S.Ct. 2800, 2809, 61 L.Ed.2d 587, 599–600 (1979), making clear that § 552(b)(5) does not necessarily incorporate every privilege known to civil discovery.

The three specific issues, in terms of that aspect of the deliberative process privilege, are (1) whether the final cost number that was redacted from the AEC Reports is the kind of information that constitutes deliberative process material, to which an exemption under SG § 10–618(b) would apply, (2) if so, whether the privilege applies to someone like Mr. Colella—the head of a sub-agency whose own ability to act on the information in any effective way has not been established, and (3) if it does, whether Mr. Colella effectively invoked the privilege. Although we have some question as to issues (2) and (3), we need not address them, as we shall answer question (1) in the negative.

The permissive denial allowed by SG § 10–618(b) applies to interagency or intra-agency letters or memoranda that would not be available by law to a private party in litigation with the unit. Stromberg does not contest that the redacted information in the AEC Reports was part of an interagency or intra-agency memorandum from Mitchell to Colella. The question is whether that information would be available to a private party in litigation with the University. In that regard, we may look not only at our prior cases, but also Federal cases construing the FOIA analog, 5 U.S.C. § 552(b)(5), from which § 10–618(b) was derived. *See Cranford, supra*, 300 Md. 759, 772–74, 481 A.2d 221, 227–29.

In *EPA v. Mink, supra*, 410 U.S. at 86–87, 93 S.Ct. at 835–36, 35 L.Ed.2d at 132, the Supreme Court, quoting in part from *Kaiser Aluminum & Chemical Corp. v. United States*, 141 Ct.Cl. 38, 157 F.Supp. 939, 946 (1958), concluded that the intent behind § 552(b)(5), was "to incorporate generally the recognized rule that 'confidential intra-agency advisory opinions . . . are privileged from inspection,'" and that the public policy behind that privilege was "the policy of open, frank discussion between subordinate and chief concerning administrative action." As further explicated in *NLRB v. Sears, Roebuck & Co. supra*, 421 U.S. 132, 149, 95 S.Ct. 1504, 1515–16, 44 L.Ed.2d 29, 46–47, § 552(b)(5) protects only (1) those confidential advisory opinions, disclosure of which "would be injurious to the consultative functions of government," and (2)

attorney-client and attorney work product privileges generally available to all litigants, quoting again from *Kaiser Aluminum & Chemical Corp. supra,* 157 F.Supp. at 946. The focus, said the *NLRB* Court, is on documents "reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *NLRB,* 421 U.S. at 150, 95 S.Ct. at 1516, 44 L.Ed.2d at 47.

Because the focus is on the decision-making process, the Federal courts have construed § 552(b)(5) as protecting only "pre-decisional" communications, not those made after the decision is made. The *NLRB* Court explained that, although "[t]he quality of a particular agency decision will clearly be affected by the communications received ... prior to the time the decision is made ... it is difficult to see how the quality of a decision will be affected by communications with respect to the decision occurring after the decision is finally reached." *Id.* at 151, 95 S.Ct. at 1516–17, 44 L.Ed.2d at 47. Thus, to shield a record under § 552(b)(5), the agency ordinarily must establish that the record is both pre-decisional and deliberative. *See Hopkins v. U.S. Dept. of Housing & Urban Dev.,* 929 F.2d 81, 84 (2nd Cir.1991); Ann K, Wooster, *What are interagency or intra-agency memorandums or letters exempt from disclosure under the Freedom of Information Act, 5 USCA § 552(b)(5),* 168 ALR Fed 143, 192 (2001). The *NLRB* Court cautioned, however, that the line between pre-decisional and post-decisional documents may not always be a bright one—that decision-making is often a continuing process and that the privilege does not turn on the ability of the agency to identify a specific decision to which the memorandum relates. *Id.* at 151–52, n. 18 and 19, 95 S.Ct. at 1517, 44 L.Ed.2d at 48.

■ Given the purpose of the AEC Reports, as explained in Mr. Colella's affidavit, there can be little doubt that the reports, and especially the total forecasted cost of the project, is pre-decisional in nature. The function of the reports, and of the forecasted total cost, is to allow the University to monitor the progress of the project, to determine, as the affidavit

states, whether additional funding or resources will be necessary and should be requested. The question is whether that number is deliberative in nature.

In that regard, both the Supreme Court, with respect to FOIA, and this Court, with respect to PIA, have drawn a general distinction between purely factual data and deliberative opinions, noting, however, that the distinction is not always a clear one and is not rigid. In *EPA v. Mink, supra*, 410 U.S. at 87–88, 93 S.Ct. at 836, 35 L.Ed.2d at 132, the Court observed that "memoranda consisting only of compiled factual material or purely factual material contained in deliberative memoranda and severable from its context would generally be available for discovery by private parties in litigation with the Government." We noted in *Hamilton v. Verdow, supra*, 287 Md. at 564–65, 414 A.2d at 926, however, that material cannot always be neatly separated into fact-finding and decision-making categories, and that "some factual material is entitled to a degree of protection under the privilege, although not to the same extent as opinions and recommendations," referencing, as examples, "facts obtained upon promises or understandings of confidentiality, investigative facts underlying and intertwined with opinions and advice, and facts the disclosure of which would impinge on the deliberative process."

The number is largely factual in nature. Indeed, in his affidavit, Mr. Colella acknowledged that "[t]he AEC Monthly Reports consist predominantly of factual information on each project, including current and historical funding information, current and historical budget figures, expenditures for the project, and information regarding the project's schedule." That information is objectively ascertainable and documented, and is not at all deliberative in nature. As Mr. Colella's affidavit indicates, the number also incorporates Mr. Mitchell's estimates, predictions, or evaluations and, to that extent, constitutes Mitchell's views as to the validity or value of pending or possible claims or the course of further construction. That, indeed, is the basis for the University's claim of privilege.

If we were dealing with any clear articulation of those views—if, in his report, Mr. Mitchell set forth his analysis of pending or possible claims, or what remained to be done, or the extent to which further construction would likely occur on schedule, or whether additional funding was necessary or should be sought, or whether the project should be scaled back, enhanced, or changed in some material way—we might well regard that information as deliberative and consultative in nature. If the deliberative aspects could be separated from the purely factual aspects, they might be subject to shielding. The one aggregate number that allegedly incorporates but does not identify or segregate Mr. Mitchell's consultative views does not have that status, however. It is impossible to tell from that number what Mr. Mitchell's views are with respect to any particular claim, much less whether the project should be altered or additional funding should be sought. The redacted number does not, therefore, constitute a memorandum that would not be available to a private party in litigation with the University and, accordingly, is not subject to shielding under the deliberative process privilege aspect of SG § 10–618(b). *Compare Hopkins v. U.S. Dept. of Housing & Urban Dev., supra,* 929 F.2d 81, 85 (staff reports containing inspectors' professional opinions on progress and quality of construction work and recommendations to higher officials that various agency actions should be taken may be protected by § 552(b)(5); case remanded to determine whether factual and privileged contents were inextricably intertwined); and *Jowett, Inc. v. Department of Navy,* 729 F.Supp. 871 (D.D.C. 1989) (report of auditors hired to evaluate applicant's claim and containing auditor's recommendations and opinions regarding aspects of the claim shielded under § 552(b)(5)).

### Confidential Commercial Information

Alternatively, the University relies on another privilege generally recognized under the civil discovery rules that has been incorporated by decisional law within the ambit of 5 U.S.C. § 552(b)(5) and that it urges should be incorporated within the ambit of SG § 10–618(b)—that of confidential com-

mercial information. Because there is no definitive Maryland law on this point, the University relies on Federal cases interpreting FOIA, mostly *Federal Open Market Committee v. Merrill, supra,* 443 U.S. 340, 99 S.Ct. 2800, 61 L.Ed.2d 587. At issue there, among other things, was whether Domestic Policy Directives issued on a monthly basis by the Federal Reserve Board's Federal Open Market Committee (FOMC) were subject to immediate public inspection under § 552. Those Directives, issued immediately following the FOMC monthly meeting, summarized the economic and monetary background of the FOMC's deliberations and indicated whether the Committee intended to follow an inflationary, deflationary, or unchanged monetary policy in the month ahead. The Directives also included specific tolerance ranges for growth in the money supply and for the Federal Funds rate. FOMC withheld disclosure of the Directive for 45 days in accordance with FOMC regulations, at which point a new Directive was in place.

After rejecting most of FOMC's arguments against immediate disclosure, the Court concluded, from some of the legislative history of FOIA, that § 552(b)(5) incorporated a qualified privilege for confidential commercial information, "at least to the extent that this information is *generated by the Government itself* in the process leading up to awarding a contract." *Id.* at 360, 99 S.Ct. at 2812, 61 L.Ed.2d at 603. (Emphasis added).[3] The Court held that the Directives were confidential and commercial in nature and that, in a broad way, they were relevant to the process for awarding contracts—the purchase of Government securities in the open market. Still, the Court noted that the privilege for such information was not complete, even under the civil discovery rules, and it approved an exemption under § 552(b)(5), for the limited period of 45 days,

---

**3.** This condition is important to note. SG § 10–617(d) requires a custodian to deny inspection of any part of a public record that contains confidential commercial or financial information that was obtained from another person or governmental unit. The University does not contend that the information at issue here is of that character and does not assert a § 10–617(d) privilege.

only to the extent that the Directives "contain sensitive information not otherwise available, and if immediate release of these Directives would significantly harm the Government's monetary functions or commercial interests." *Id.* at 363, 99 S.Ct. at 2813, 61 L.Ed.2d at 605. The case was remanded for the trial court to make those determinations.

In conformance with *Merrill,* the lower Federal courts have shielded, *on a temporary basis,* such information as a real estate appraisal obtained by a Federal agency to assist in determining the price to be asked for surplus property (*Government Land Bank v. General Services Admin.,* 671 F.2d 663 (1st Cir.1982)), data used by the Army in preparing an in-house bid in competition with bids from private contractors and that, if released prior to the opening of all bids, would allow other bidders to anticipate the Army's bid (*Morrison–Knudsen Co. v. Dept. of the Army of U.S.,* 595 F.Supp. 352 (D.D.C.1984), *aff'd.,* 762 F.2d 138 (D.C.Cir.1985)), and conceptual design reports prepared in order to fix the scope and estimate the cost of projects which, if released prematurely, could be detrimental to the process for selecting architects and engineers for the project (*Hack v. Department of Energy,* 538 F.Supp. 1098 (D.D.C.1982)).

■■ We agree with the University that the limited and time-sensitive exemption for confidential commercial or financial information that has been read into FOIA, § 552(b)(5), is part of SG § 10–618(b) as well. That kind of information may be shielded from discovery by a protective order under Maryland Rule 2–403, as it is under F.R. Civ. Proc. 26(c). That does not avail the University in this case, however, for two reasons. For one thing, the University does not assert a time-limited privilege, as was recognized in the Federal cases, but seems to assert that the number in question may *never* be revealed. That extends well beyond what the Federal courts have allowed under § 552(b)(5). More important, for the reasons discussed with respect to the deliberative process privilege, we fail to see how the number would disclose any time-sensitive confidential commercial information. As we

170

have indicated, it is an aggregate number that does not reveal Mr. Mitchell's, or anyone else's, views as to the validity or value of claims or the future status of the project.

### Conclusion

For the reasons stated, we shall affirm the Circuit Court judgment with respect to redacted information other than the number for forecasted total cost of the Stamp project. As to that number, as it appears on the requested records, we shall reverse the judgment and remand for entry of an order directing the University and the custodians of the records to permit inspection of that information and for such ancillary relief as may be appropriate.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED TO CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR FURTHER PROCEEDINGS IN CONFORMANCE WITH THIS OPINION; COSTS TO BE PAID BY APPELLEES.