21 A.3d 199

Jack JOHNSON

v.

Marilyn CLARK, et al.

No. 2298, Sept. Term, 2010.

Court of Special Appeals of Maryland.

June 2, 2011.

306

Timothy W. Fitzmaurice (Stephen W. Thibodeau, Prince George's County Officer of Law, on the brief), Upper Marlboro, MD, for Appellant.

David Haynes, Washington, D.C. (Michael J. Winkelman, McCarthy, Winkelman & Morrow, LLP, on the brief), Bowie, MD, for Appellee.

Panel: EYLER, JAMES R., WRIGHT, LAWRENCE F. RODOWSKY, (Retired, specially assigned), JJ.

EYLER, JAMES R., J.

 This interlocutory appeal,[1] pursuant to Maryland Rule 8–207,[2] arises out of an order of the Circuit Court for

---

1. We note that despite the fact that discovery orders are not ordinarily appealable prior to a final judgment terminating the case in the trial court, *see, e.g., Montgomery Co. v. Stevens,* 337 Md. 471, 477, 654 A.2d 877 (1995) neither party raises or addresses the issue of appealability. Because the issue of appealability is jurisdictional, *see, e.g., PSC v. Patuxent Valley Conservation League,* 300 Md. 200, 477 A.2d 759 (1984) (providing that "finality is a matter ultimately to be determined by [the] Court."), however, we shall acknowledge its existence, and conclude that the issue presented is appealable under the "collateral order doctrine." *Id.*

In *Patuxent Valley,* the Court of Appeals observed that although ordinarily an appeal will lie only from a final judgment, the collateral order doctrine treats as final and appealable a limited class of orders which do not terminate the litigation in the trial court. *Id.* at 206, 477 A.2d 759. The doctrine generally permits an appeal from an order that satisfies four requirements: " '[T]he order must [(1)] conclusively determine the disputed question, [(2)] resolve an important issue[, (3) be] completely separate from the merits of the action, and [(4)] be effectively unreviewable on appeal from a final judgment.' " *Id.* (other citation omitted). *See also Ehrlich v. Grove,* 396 Md. 550, 914 A.2d 783 (2007) (holding that an interlocutory appeal is appropriate under the extraordinary circumstance of a discovery order being directed to a Governor of Maryland when the collateral order doctrine's four-part test is met); *St. Joseph Medical Center, Inc. v. Cardiac Surgery Associates, P.A.,* 392 Md. 75, 896 A.2d 304 (2006) (noting that the only situations in which the Court of Appeals "has held that interlocutory discovery orders are appealable under the collateral order doctrine" have involved trial court orders "permitting the depositions of high level government decision makers for the purpose of extensively probing their individual decisional thought processes.").

In the case before us, appellant makes three contentions: (1) that the requested information is not discoverable under Maryland law; (2) that the requested discovery, i.e., the deposition of a county executive, does not fit within the exceptions to the *Morgan* [*United States v. Morgan,* 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429 (1941)] doctrine; and, (3) that executive privilege applies. We conclude that contentions (2) and (3) satisfy the collateral order exception.

Prince George's County, denying the motion to quash notice of deposition and/or motion for protective order of former County Executive Jack B. Johnson, appellant, thereby granting Marilyn Clark, Chris Furbush, and Robert White, appellees, the right to depose appellant. On appeal, appellant contends the court abused its discretion in denying his motion. We agree, and shall reverse.

## Factual Background

Because this is an expedited appeal, pursuant to Maryland Rule 8–207(b)(2),[3] the parties have jointly filed an agreed statement of the case, including the essential facts. Thus, we shall quote directly therefrom for background. We shall supplement the facts with additional information as necessary.

The claims in *Clark et al. v. Kevin* [sic] *Washington, et al.,* CAL08–02332, arise from the January 24, 2007 shooting of Brandon Clark and Robert White by Keith Washington. The January 24, 2007 shooting occurred inside the home of Keith Washington at approximately 7:45 p.m. Brandon Clark and Robert White were delivering furniture for Mario Furniture to the home of Keith Washington. A series of events transpired in the home that resulted in Keith Washington discharging his firearm five times. Brandon Clark died as a result of his injuries. Robert White survived but was maimed by the three gunshot wounds.

A criminal indictment was filed against Keith Washington. A jury trial was held and Keith Washington was found guilty of involuntary manslaughter, first degree assault and use of a handgun in the commission of a felony or crime of violence. He was sentenced to 45 years. The conviction was upheld by the Maryland Court of Special Appeals and certiorari was denied by the Maryland Court of Appeals.

---

**2.** Maryland Rule 8–207(b) provides the procedures for expedited appeals when the parties so elect.

**3.** *See* n. 2, *supra.*

On the date of the shooting, Keith Washington was employed as a Prince George's County Police Officer who had been detailed to the Prince George's County Department of Homeland Security (hereinafter "DHS") as a Deputy Director. Washington was detailed to DHS on or about August 2, 2004 and during his detail assignment was paid by the Police Department, not the DHS.

Washington's supervisor and the only person he reported to at DHS was the Director of DHS, Vernon Herron. Washington's duties at DHS were primarily administrative, dealing with obtaining funding and grants for the various public safety agencies of Prince George's County; his duties at DHS did not entail the use of police powers. Washington maintained his police powers in his capacity as a police officer. Washington was on duty in his capacity at DHS only during normal working hours that ended at 5:00 pm, with the exception of some occasions in which Director Herron would assign some duties such as community relations. DHS does not confer any police powers to its employees, and it is not something that DHS oversees. Neither did DHS oversee Washington's right to carry a gun, which is done pursuant to requirements of the Prince George's County Police Department and the Maryland Police Training Commission.

Washington was appointed to the position at DHS by then Prince George's County Executive Jack Johnson.[4] It is unclear whether Mr. Washington interviewed for the position, whether the position was posted, or whether other applications were submitted for the position. Mr. Herron had no involvement in the process which led to the hiring of Mr. Washington. Mr. Herron's only prior knowledge of Mr. Washington was through Mr. Washington's prior detail as executive protection to the county executive, Jack Johnson.[5

4. In his brief, appellant states that he served as county executive from 2002 until December 6, 2010.

5. We can find nothing in the record to indicate when Washington was assigned to Johnson's detail.

[1] Mr. Johnson was responsible for the hiring, screening and promotion of Keith Washington to his position with DHS.

While Washington was detailed to DHS, he maintained his police powers and his police issued gun. The gun Keith Washington used on the date of the incident of January 24, 2007, was issued to him by the Prince George's County Police Department. After the shooting of January 24, 2007, it was the Police Department, not DHS, that investigated the shooting. As a police officer, Washington's employment status, including evaluations, retention, promotions, demotions, discipline, suspension of police powers and issuance of police equipment, including firearms, was governed by the police department.

Plaintiffs filed their Complaint on January 24, 2008 against the Defendants Prince George's County, Maryland and Keith Washington. Plaintiff's Complaint pled the following counts against both defendants: Count I, Assault; Count II, Battery; Count III, Intentional Infliction of Emotional Distress; County IV, False Arrest; Count V, False Imprisonment; Count VI, Negligence; Count VII, Fraud; Count VIII, Gross Negligence; Count IX, Negligent Hiring and Retention; Count X, Violations of Maryland Declaration of Rights/State Constitutional Claims; Count XI, Vicarious Liability; Count XII, Negligent Entrustment; Count XIII, Wrongful Death; and Count XIV, Survival Action.

On March 10, 2008, Defendant Prince George's County, Maryland moved to dismiss and/for partial summary judgment on all Counts, except on Count X, on the basis of the Defendant County's governmental immunity for non-constitutional torts. Additionally, Defendant County asked for dismissal of any claim of punitive damages against the Defendant County, as punitive damages are not available against governmental entities.

On June 6, 2008, a motions hearing was held before Judge Sean Wallace, who granted the County's motion to dismiss, leaving only one count—Count X—against the County. Count X alleges the following:

*COUNT 10*

(Violations of Maryland Declaration of Rights/State Constitutional Claims)

110. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

111. This is, in part, an action to redress the deprivation under color of statute, ordinance, regulation, custom, or usage of a right, privilege, and immunity are secured to the Plaintiff by the Declaration of Rights of the Constitution of the state of Maryland including but not limited to Articles 2, 19, 24, 26, and arising under the law and statutes of the State of Maryland.

112. During all times mentioned herein, Defendants Washington and Defendant County, separately and in concert, engaged in illegal conduct herein mentioned, to the injury of the Plaintiffs and Brandon Clark and deprived the Plaintiffs and Brandon Clark of their then existing and clearly established rights, privileges, and immunities secured to them by the Declaration of Rights of the Constitution of the State of Maryland, including but not limited to Articles 2, 19, 24, 26, and arising under the laws and statues [sic] of the State of Maryland.

113. Defendants acting under color of law, have subjected the Plaintiffs and Brandon Clark to conduct consisting, of use of unreasonable, unnecessary, and excessive force, and police misconduct and false imprisonment, in denial of rights, privileges, and immunities guaranteed to the Plaintiff by the Constitution of the State of Maryland.

114. This conduct consists of acts of excessive force, improper supervision, police misconduct, and use of unnecessary and unreasonable force, and the other allegations set forth above which was visited on the Plaintiffs and Brandon Clark by Defendant Washington as a member of the Prince George's County Police Department and a member of the Prince George's County Government and agents and employees of Defendant County, acting under

color of law. These acts of violence, while carried out under color of law, have no justification or excuse in law, and are instead gratuitous, illegal, improper, objectively unreasonable, and unrelated to any activity in which police officers may appropriately and legally engage in the court protecting persons or property or ensuring civil order.

115. The acts alleged herein violated clearly established constitutional rights of the Plaintiffs and Brandon Clark, were not objectively reasonable, and were done under circumstances in which no reasonable officer would fail to realize, that his or, her conduct was a violation of the Plaintiffs rights.

116. Defendants acted outside the scope of their jurisdiction and without authorization of law, and acted willfully, knowingly, and purposefully with specific intent, to deprive the Plaintiffs of their rights, privileges, and immunities secured to them by the Constitution of the State of Maryland, including, but not limited to, the following: freedom from illegal detention or imprisonment; freedom from the use of excessive of [sic] unreasonable force; freedom from physical abuse, coercion, and intimidation; the right to due process; the right to life; the right to liberty; and the right to property; and freedom for [sic] unreasonable searches and seizures. All of these rights are secured to the Plaintiffs and Brandon Clark by the provisions of the Declaration of Rights of Constitution of the State of Maryland.

117. The acts alleged herein were intentionally performed, without legal justification or excuse, but with an evil or rancorous motive influenced, by hate, the purpose being to deliberately, and willfully injure the Plaintiffs and Brandon Clark.

118. As a result of the Defendants conduct as set forth above Robert White has suffered and will continue to suffer severe mental anguish, emotional distress, medical and other related expenses and loss of income.

119. As a result of the Defendants conduct as set forth above Brandon Clark suffered severe mental anguish, emotional distress, medical and other related expenses and a loss of income.

On February 17, 2009, the County moved for summary judgment on Count X on the grounds that there was no dispute of material fact that Defendant Washington was not acting in the scope of employment at the time of the incident. The motion was denied by the Court. At that same hearing, the Court granted Defendant Washington's motion to bifurcate any remaining constitutional claims against the County as pled in Count X. The county joined in that motion. The Court granted Defendant Washington's motion, and trial proceeded against Defendant Washington and against Defendant County as to the question of scope of employment.

The first jury trial in this matter commenced on March 23, 2009 against both Defendants. After four days of evidence, the jury deadlocked, and a mistrial was declared on March 30, 2009. A new trial was scheduled to commence in this matter on January 25, 2010. Prior to the swearing of a jury, Plaintiffs moved to voluntarily dismiss Defendant Washington on the morning of January 25, 2010, which the Court granted. Trial then proceeded against the remaining Defendant, the County, on January 25, 2010, on the basis of *respondeat superior* liability only. At the close of Plaintiff's case on January 27, 2010, Defendant County moved for judgment. The motion was granted in favor of the County, with the trial court finding that there was insufficient evidence that Keith Washington was acting within the scope of his duties for the County or under the color of law.

The court then instructed the parties to submit memoranda on the issue of the potential remaining bifurcated claims against the Defendant County in Count X, and as to whether Plaintiffs could proceed directly against the Defendant County for any claim of constitutional torts under the Maryland Declaration of Rights. Specifically, the Court asked whether:

[T]he claim could still go forward under a Declaration of Rights, under the theory that the governmental action of entrusting Mr. Washington with a handgun exposes the County to liability in this case, even if, as I have found, there is no evidence that Mr. Washington in using it was exercising governmental acts or in the scope of his employment.

On or about March 11, 2010, Defendant County filed its Second Motion for Summary Judgment, moving for summary judgment as to Count X, the sole remaining count. On May 2, 2010, a hearing was held on this motion, with the court denying the motion pending additional discovery. On or about August 12, 2010, Plaintiffs issued a Notice of Deposition for, *inter alia,* Jack Johnson, County Executive for Prince George's County, Maryland. Plaintiffs seek to depose Johnson as to what action, if any, did Prince George's County take to address the known violent and psychological issues of Keith Washington during his employment with the County, and proffered the following topics to be addressed at Johnson's deposition:

Knowledge of Keith Washington;

Knowledge of Keith Washington's work history;

Knowledge of Keith Washington's mental history;

Knowledge of any and all worker's compensation claims filed by Washington;

Knowledge of civil lawsuits filed against Keith Washington;

Knowledge of complaints by fellow police officers against Keith Washington;

Knowledge of job performance by Keith Washington;

Knowledge of promotion of Keith Washington;

Knowledge of reprimands of Keith Washington;

Knowledge of suspensions of Keith Washington;

Knowledge of recognitions of Keith Washington;

Knowledge of recommendations for Keith Washington;

Knowledge of actions taken in response to any complaints;

Knowledge of actions taken in response to the filing of any civil lawsuits;

Knowledge of Keith Washington's police powers ever being suspended or otherwise acted upon;

Knowledge of Keith Washington's handgun ever being removed from his possession;

Knowledge of actions taken to investigate allegations of misconduct;

Knowledge of discipline of any type taken against Keith Washington or any individual associated with Keith Washington;

Knowledge of any training provided to Keith Washington;

Knowledge of any discussions had with Keith Washington regarding issues germane to this case;

Knowledge of any discussions with any other individuals regarding Keith Washington;

Knowledge of actions taken to avoid further complaints against Keith Washington;

Knowledge of letters, memos, pres releases, etc. written regarding Keith Washington;

Knowledge of assessments of Keith Washington and his performance as a police officer;

Knowledge of assessments of Keith Washington's mental fitness;

Knowledge of assessments of Keith Washington's fitness to continue as a member of the Prince George's County Police Department;

Knowledge of interactions with Keith Washington and member of the public;

Knowledge of Keith Washington's criminal arrest history;

Knowledge of Keith Washington's job performance;

Knowledge of any periodic assessments of Keith Washington's psychological fitness;

Knowledge of any periodic assessments of Keith Washington's fitness to carry a gun;

Knowledge of Keith Washington's fitness to execute police powers.

On August 19, 2010, Jack Johnson filed a Motion to Quash and/or for Protective Order, seeking relief that Plaintiffs be precluded from deposing him. On or about November 10, 2010, Johnson's Motion for Protective Order was denied. On November 17, 2010, Johnson filed a Notice of Appeal.

In addition to the foregoing, the following facts are relevant.

In addition to the notice of deposition of Johnson, appellees also issued a notice of deposition for Roberto Hylton, Prince George's County Chief of Police, as well as Vernon Herron, Director, Prince George's County Department of Homeland Security. All three notices were included as part of the motion to quash. With respect to Chief Hylton, the motion asserted that, pursuant to an affidavit of Chief Hylton's, Chief Hylton had no personal knowledge of the allegations that served as the basis for Count 10. Specifically, Chief Hylton testified to the following in his affidavit: (1) he did not become Chief until September 1, 2008;[6] thus, (2) prior to the January 24, 2007 shooting involving Keith Washington, he did not have authority to retain or dismiss Washington as a police officer; he was never an immediate supervisor of Washington; he did not perform any supervisory or fitness for duty evaluations of Washington; he was not involved in the evaluation of any workers' compensation claim of Washington; he was not involved in the issuance of Washington's police issued gun; he was not involved in investigating any complaints or discipline against Washington; and, he had no personal knowledge of a violent history or propensity of Washington to abuse police powers. On those bases, the court granted the motion to quash as to Chief Hylton.

---

6. We can find nothing in the record to indicate who was Police Chief prior to Hylton.

With respect to Vernon Herron, the motion asserted that Herron had been previously deposed on December 19, 2008, prior to the matter being bifurcated, and therefore, "the deposition was not limited." At that deposition, Herron was instructed not to answer certain questions; specifically the following transpired, as included in the motion to quash:

[Appellees' counsel]: Do you know if Mr. Washington was qualified to be the Deputy Director of Department of Homeland Security?

[County Attorney]: Objection. And I'm going to propose a—I'm going to instruct the deponent not to answer that on the issue of privilege, getting into personnel matters and executive deliberative privilege.

[Appellees' counsel]: And just so I understand, Counsel, is it your understanding that the decision to even hire an individual is protected under the personnel?

[County Attorney]: The reasoning—my position would be the reasoning. If I understand your question correctly, you know, why was he hired, that sort of thing, that's where I'm going to start posing privileges, objections.

[Appellees' counsel]: Okay, I just want to know if anyone had any appreciation for Mr. Washington's qualifications prior to his hiring. Now, if the instruction is that that is part of the deliberative process, then that's the instruction.

[County Attorney]: I'll allow Mr. Herron to answer whether he knows if anyone has. The question—I'm sorry. Can you repeat it one more time?

[Appellees' counsel]: Do you know if anything was done to understand Mr. Washington's qualifications or lack thereof prior to his appointment as Deputy Director of the Department of Homeland Security?

[County Attorney]: And I'll just pose the objection. And Mr. Herron can answer whether he knows or whether he doesn't know.

[Mr. Herron]: I do not know.

* * *

[Appellees' counsel]: Did you ever give any consideration to the public's safety when sending Mr. Washington to meet with the public in his role as Deputy Director of Department of Homeland Security?

[County Attorney]: Objection.

[Mr. Herron]: Did I ever give any consideration—

[Appellees' counsel]: Yes sir.

[Mr. Herron]:—to the public's safety?

[Appellees' counsel]: Yes, sir.

[Mr. Herron]: That was never an issue with me. He did speaking engagements. He represented me at graduations. I had no concern about the public's safety during those types of events. No sir.

[Appellees' counsel]: If you had had concern about public safety, would you have reconsidered sending Mr. Washington to do events on your behalf?

[Mr. Washington's counsel]: Objection.

[County attorney]: Objection. Let me just ponder this a second. Objection. And I'm going to instruct the client not to answer. I think it's getting beyond facts testified that have even been testified to and that have even come out through discovery. And I'll just leave it at that.

\* \* \*

[Appellees' counsel]: Did you have an understanding why Mr. Johnson appointed Mr. Washington to be your deputy?

[Mr. Washington's counsel]: Objection.

[County Attorney]: Objection. Objection. And I'll allow the deponent to answer whether he had an understanding or not.

[Mr. Herron]: I'm sorry. Could you repeat the question?

[Appellees' counsel]: Sure.

[Appellees' counsel]: Did you have an understanding through conversations with Mr. Johnson why he appointed Keith Washington to be your deputy director?

[Mr. Herron]: I did.

[Appellees' counsel]: And what was your understanding?

[County Attorney]: Objection. And I'll instruct the deponent not to answer an issue of privilege.

According to the motion to quash, because appellees had already had an opportunity to depose Herron, they should not be allowed to again, and moreover, the *Morgan* doctrine applied, as the issues related to Washington's role at DHS were "not relevant and essential to the basis of Count 10," i.e., Washington's "retention as a police officer and entrustment of a police issued gun."

The court denied the motion "to the extent that [Herron] does need to answer those questions that were asked at [the] deposition and he was not permitted to answer. The court stated the following:

I don't think *Morgan* stands for the proposition that because you're a high-ranking official, you don't have to answer any questions. He willingly submitted to a deposition. This is a unique case where we're talking about—*Morgan* talked about the litigation-related burdens that would be on those high-ranking officials if they had to be deposed in all these other cases and every kind of case. This is a rare case where the allegation is, and I think there's not a lot of dispute as to at least part of it, that Mr. Johnson was, knew, knew Mr. Washington, that they were good friends and that Mr. Johnson intervened on his behalf or advocated for him. And, I guess, he didn't really had [sic] to advocate. He was the decision maker. He intervened on his behalf in personnel decisions. And the inquiries into that, I think, are legitimate and not covered within the scope of the *Morgan* case or, and they're not the kind that by ordering in this case would open up the flood gates for the Public Safety Director and/or the County Executive to have to show up at all depositions in all cases of excessive police force. This is a unique case, given the facts, and so I'm going to deny it. So I'm going to deny it as to Her[r]on with the, now, this isn't free reign to open a whole another deposition. He willingly submitted to one. But the questions that were asked and, obviously, any legitimate follow-up to those, but

the questions on those areas that were asked and for Mr. Johnson, you know, all the questions relating to his knowledge of Mr. Washington, their involvement, their connections, and what, if anything, he did with regard to Washington's employment.

We presume that Herron was again deposed in accordance with the court's order, but any supplemental responses do not appear to have been made part of the record.

From appellees' opposition to appellant's motion to quash and/or for protective order, which provides, in part, that the appellees were "seeking to learn what the County did since at least 1995 to 'investigate, discipline and take action' with regard to Keith Washington," it appears that Washington joined the police department sometime before 1995, although we can not locate an exact date. From the hearing on the motion to quash, however, there does not appear to be any dispute that Washington was hired to work for the police department "years before Jack Johnson was even County Executive."

That same pleading also asserts that there were "known violent and psychological issues of Keith Washington during his employment with Prince George's County." In appellees' complaint, they had asserted, *inter alia*, that, several years prior to the shooting, after Washington filed a workers' compensation claim against the County, he had been placed on restricted duty by the County after doctors and department officials "determined that his inability to handle the stress of regular police work made him a potential danger"; that as part of the workers' compensation claim, the County had ordered psychiatric evaluations of Washington, which revealed that he had "homicidal and suicidal thoughts, fits of internal rage and he was a potential danger to members of the public"; and that, at that time, the County had requested that Washington turn over his service weapon, which they later returned to him and then promoted him.

In their opposition to appellant's second motion for summary judgment, appellees expounded further on their allega-

tions of Washington's psychiatric health and appellant's knowledge of same. Specifically, appellees asserted that they were seeking to discover information regarding: independent medical evaluations ordered by the County in contesting Washington's workers' compensation claim, which claim was a result of a "psychological injury"; prior lawsuits that had been filed by members of the public against Washington, alleging brutality and abuse of police power; complaints of fellow officers against Washington involving "violent" encounters; citizen complaints against Washington by citizens who had been threatened with physical violence, irrational actions, and abuse of police powers; an indictment occurring several months after the January 24 shooting, wherein Washington pulled a police issued handgun on a real estate appraiser.

With respect to the allegations of Washington's prior psychological/psychiatric issues, aside from the allegations made by appellees, we glean from the record that some records existed in that regard. Because Washington had filed a previous claim for workers' compensation, therefore he had provided those records to the County, no privilege attached; thus, the court denied a motion for protective order filed by the County in that regard, and the County was required to provide the records to appellees in discovery, although we do not know what specific information the discoverable records contained. As for any possible existing records from treating psychologists or psychiatrists that had not been disclosed for purposes of a claim or defense of Washington in another case, the court granted the County's motion for protective order.

## Discussion

### Rules of discovery

■ Maryland Rule 2–402(a) provides, in part, that as a general principle, "[a] party may obtain discovery," which includes by way of deposition, "regarding any matter that is not privileged ... if the matter sought is relevant to the subject matter involved in the action, whether it relates to the claim or defense of the party seeking discovery...." The information sought must be "reasonably calculated to lead to

the discovery of admissible evidence." *Id.* Maryland Rule 2–403(a) provides that a party or person from whom discovery is sought, and for good cause shown, may seek a protective order to protect that party or person "from annoyance, embarrassment, oppression, or undue burden or expense...." Trial judges administer the discovery rules, and are vested with a reasonable, sound discretion in applying them, which discretion will not be disturbed in the absence of abuse. *See, e.g., Kelch v. Mass Transit Admin.,* 287 Md. 223, 229–30, 411 A.2d 449 (1980).

### Morgan doctrine

In *Morgan,* 313 U.S. 409, 61 S.Ct. 999, *supra* n. 1, the Supreme Court created an exception to the general discovery principles as it applies to high-ranking officials holding public office. *Id.* at 422, 61 S.Ct. 999. Under the doctrine, as developed in later case law, high-ranking government officials are not subject to being deposed with respect to their mental processes in performing discretionary acts. *In Re Office of Inspector General,* 933 F.2d 276, 278 (5th Cir.1991); *Singer Sewing Machine Co. v. NLRB,* 329 F.2d 200, 206–08 (4th Cir.1964). The privilege applies to former as well as current officials. *Arnold Agency v. West Virginia Lottery Commission,* 206 W.Va. 583, 526 S.E.2d 814, 830 (1999).

The *Morgan* doctrine is not absolute, for instance, in situations where a high-ranking official's involvement becomes less supervisory and directory and more hands-on and personal, that it is considered so intertwined with the issues in controversy, fundamental fairness may require the deposition of an official. In general, a deposition of a high-ranking official in litigation not specifically directed at his alleged misconduct will only be permitted if (1) extraordinary circumstances are shown, *United States v. Merhige,* 487 F.2d 25, 29 (4th Cir.1973); or (2) the official is personally involved in a material way. *Singer Sewing Machine Co.,* 329 F.2d at 206–08. The burden is on the party seeking the deposition of the high-ranking official to demonstrate the existence of the foregoing.

■■■ With respect to personal involvement, knowledge or awareness of information that may be helpful if discovered is insufficient to make the requisite showing. With respect to determining whether extraordinary circumstances exist the courts consider whether the party seeking the deposition has shown:

(1) that the official's testimony is necessary to obtain relevant information that is not available from another source; (2) the official has first-hand information that could not be reasonably obtained from other sources; (3) the testimony is essential to that party's case; (4) the deposition would not significantly interfere with the ability of the official to perform his government duties; and (5) that the evidence sought is not available through any alternative source or less burdensome means.

*Buono v. City of Newark,* 249 F.R.D. 469, 470 (2008) (citing *Bogan v. City of Boston,* 489 F.3d 417 (1st Cir.2007)).

The privilege recognized in *Morgan* has been applied in Maryland. *See, e.g., Hamilton v. Verdow,* 287 Md. 544, 562, 414 A.2d 914 (1980), *PSC v. Patuxent Valley Conservation League,* 300 Md. at 214, 477 A.2d 759, *supra* n. 1, and *Montgomery County v. Stevens,* 337 Md. at 481, 654 A.2d 877, *supra* n. 1.

### Executive privilege

*Hamilton,* 287 Md. 544, 414 A.2d 914, *supra,* is the seminal Maryland case on executive privilege. There, the Court of Appeals examined the question of whether an investigative report prepared in confidence for the Governor of Maryland by the Governor's staff should be barred from discovery and *in camera* inspection on the basis of executive privilege. *Id.* at 553–54, 414 A.2d 914. The Governor requested the report following a tragic event—a state hospital released a pedophile, who then murdered several children. *Id.* at 546–47, 414 A.2d 914. The report was to be made "for the purpose of potential future executive action in order to attempt to prevent or minimize similar occurrences by identifying and assessing any

deficiencies within the governmental systems. . . ." *Id.* at 548, 414 A.2d 914.

The *Hamilton* Court set forth the law on executive privilege. First, it noted that executive privilege is "also sometimes referred to as the privilege for 'governmental secrets,' or as the 'state secret privilege' and 'official information privilege.' " *Id.* at 556 n. 3, 414 A.2d 914 (citations omitted).

With respect to the type of content protected, the Court explained that "the doctrine of 'executive privilege' encompasses both the privilege for state and military secrets as well as the privilege for certain official information.' " *Id.* The term "official information" clearly encompasses "confidential advisory and deliberative communications between officials and those who assist them in formulating and deciding upon future governmental action[,]" as "[a] fundamental part of the decisional process is the analysis of different options and alternatives" and "[a]dvisory communications, from a subordinate to a governmental officer, which examine and analyze these choices, are often essential to this process." *Id.* at 558, 414 A.2d 914. Citing, *inter alia, Morgan,* the Court added more generally that executive privilege "gives a measure of protection to the deliberative and mental processes of decisionmakers." *Hamilton,* 287 Md. at 561, 414 A.2d 914.

The Court then examined the roots of executive privilege. It explained that, although the concept of executive privilege "has been considered part of the common law of evidence[,] . . . it is clear that the doctrine of executive privilege also has a basis in the constitutional separation of powers principle." *Id.* at 562, 414 A.2d 914. In fact, the Court averred that

'executive privilege' may well be an overly narrow term, because the privilege extends beyond the executive branch of government. As it has roots in the constitutional doctrine of separation of powers, a similar privilege extends to the judicial and legislative branches as well.

*Id.* at 556 n. 3, 414 A.2d 914.

The Court then turned to the issue of courts' roles in applying the doctrine of executive privilege when it comes up in litigation. *Id.* at 562, 414 A.2d 914.

The law of executive privileges has been discussed further in Maryland cases following *Hamilton*. *See, e.g., Office of the Governor v. Washington Post Co.*, 360 Md. 520, 759 A.2d 249 (2000); *Stromberg Metal Works Inc. v. Univ. of Md.*, 382 Md. 151, 854 A.2d 1220 (2004); *Ehrlich v. Grove*, 396 Md. 550, 914 A.2d 783, *supra* n. 1.

The relationship between the doctrine of executive privilege and the *Morgan* doctrine is unclear. The Maryland cases discussed above do not clearly distinguish the doctrines, including distinctions as to whom they apply and distinctions as to the nature of information they protect. Because neither appellees nor the trial court addressed the issue of executive privilege, it is unnecessary for us to elucidate that uncertain relationship today. By contrast, the *Morgan* doctrine was fully briefed, and because it supports our conclusions in this case, we shall base our ruling on that privilege alone.

### Parties' contentions

As noted above, appellant makes three contentions: (1) that the requested information is not discoverable under Maryland law; (2) that the requested discovery, i.e., the deposition of a county executive, does not fit within the exceptions to the *Morgan* doctrine; and, (3) that executive privilege applies. With respect to (1), appellant argues that his deposition will not lead to relevant or other information " 'reasonably calculated to lead to the discovery of admissible evidence,' " within the meaning of Maryland Rule 2–402. In that regard, appellant asserts that there is no allegation that he had any personal knowledge as to what occurred in Washington's home at the time of the shooting; that Washington maintained a police issued firearm because of his status as a police officer, not because of his status with DHS; that the police department governed Washington's employment and the issuance of the firearm to him; and, that appellant had no control over Washington's qualifications as a police officer or of his use of a police issued firearm.

With respect to (2), appellant argues that appellees did not establish the exceptions to the *Morgan* doctrine, as was their

burden, that appellant's testimony was necessary to obtain relevant information as to Count 10 that was not available from another source; that it has not been established that appellant "even has any personal knowledge" of the claims of the underlying lawsuit; and, that appellees did not establish that appellant's testimony was in any way essential to the basis of their claim in Count 10.

With respect to (3), appellant asserts that "not only is the information sought from appellant not relevant, and fails to meet the *Morgan* exceptions, but questions as to why Keith Washington was appointed to DHS as a Deputy invokes executive and advisory privileges," pursuant to, *e.g.*, *Ehrlich, supra.* In that regard, according to appellant, questions regarding appellant's "thought process of appointing Washington as Deputy of DHS, what he knew and how he processed and weighed that information," and questions as to why appellant "decided to appoint Washington to DHS," would "encroach upon [appellant's] deliberative and executive privilege, not to mention [the fact that the information was] immaterial as to count 10."

Appellees assert that they sought to discover information relevant to whether the County committed an Article 24 [7] violation with their continued employment of Keith Washington," by negligently entrusting Washington with a handgun, promoting him through the police department, and creating a special position for him with the DHS. Appellees assert that they "attempted to learn this information through deposition," but the deposition of Washington's supervisor, Herron, was inadequate as Herron "advised that he had no knowledge of the facts relevant to [a]ppellee's claims," i.e., knowledge of Washington's psychological issues, misconduct, internal investigations, and civil complaints against him, or knowledge of Washington's "personal relationship" with appellant. Thus, all

---

7. Article 24 of the Maryland Declaration of Rights—Due process—provides that "[t]hat no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

"such information appears to be exclusively within the knowledge of Jack Johnson," and therefore, appellees requested a deposition of him to prove their claim.

Appellees continue that "[a]ll five" of the *Morgan* factors, "weigh heavily in favor" of appellees, in that (1) the deposition seeks to obtain relevant information as to what information appellant knew about Washington and what actions he took in that regard, and that that information could not be obtained from another source; (2) the first-hand information of appellant is not available from any other source; (3) the information is "paramount to" appellees' ability to prove their claim; (4) the testimony would not significantly interfere with appellant's governmental duties, and that he no longer serves as county executive; and, (5) the County "has failed to identify any other source where the [a]ppellees could learn the requested information," and "the individual knowledge of Jack Johnson could not come from any other source."

### Analysis

■ We reiterate that the sole claim remaining in the case is, in essence, based on negligent entrustment of a gun to Washington. We assume that claim encompasses the initial entrustment and the continuing entrustment up to the time of the incident.

For reasons discussed above, our analysis focuses on the *Morgan* doctrine—not on executive privilege.[8] Ultimately, we

---

8. Nonetheless, we note in passing that the language used in Maryland case law to describe executive privilege is broad and would probably include a county executive, although it is uncertain. *See Stromberg*, 382 Md. at 161, 854 A.2d 1220, *supra*, (noting that executive privilege "reaches public attention most dramatically when invoked to shield records made in connection with the deliberative decision-making process used by chief or *high Executive officials—Presidents, Governors, and their immediate advisors* ") (emphasis added). *See Marisol v. Giuliani*, 1998 WL 132810, 1998 U.S. Dist. LEXIS 3719 (S.D.N.Y 1998) (extending the executive privilege to the Mayor of New York City). Even if the privilege did extend to a county executive, it is unclear whether the content at issue in the case *sub judice* is the type that would be covered by the privilege. These uncertainties stem, no doubt, from

conclude that the deposition should not occur because any information not protected under the *Morgan* doctrine is irrelevant. We observe the following.

Appellees appear to implicitly rely on an assertion that appellant had personal involvement in a manner that is relevant and material to the claim. As noted above, appellees also assert that appellant's knowledge is not available from any other source. Appellees wish to depose appellant to inquire as to his knowledge of Washington's work history, mental health history, workers' compensation claims, job training and performance, and complaints against him.

Under the case law, appellees have to show more than that the deponent has knowledge which might be helpful. The extent of personal involvement envisioned by the cases is substantial, specifically, that the involvement is "so intertwined with the issues in controversy" as to warrant disclosure. Here, there is nothing to show appellant's involvement other than that he appointed/transferred/promoted Washington to his position in the DHS and, at some prior point in time, Washington was assigned to appellant's security detail. There is also no showing that appellant had any personal knowledge of the incident or the claims giving rise to the underlying lawsuit.

Washington was a police officer and was issued a gun prior to appellant's election as county executive. The police department governed Washington's employment. Washington's job duties at the time of the incident are irrelevant because he was not acting in the scope of his employment—as the circuit court has already found—and his job at the DHS had nothing to do with the fact that he possessed a county issued gun. In fact, he possessed a county issued gun because he was a police officer and his possession was within the law. Appellant had no personal involvement in the fact that Washington was a police officer and, therefore, that he possessed a gun. Thus,

the fact that "[t]he term 'executive privilege[ ]' . . . is a broad and ill-defined term . . . ." *Id.*

to the extent appellant has personal knowledge which does not implicate his mental process or why he did or did not do something, it is not relevant to the claim, as is required by Rule 2–402(a).

Appellant's knowledge of matters such as Washington's work and mental health history are relevant only if used to challenge appellant's action or inaction. To the extent discovery is sought as to why appellant took or did not take action to "address the known violent and psychological issues" of Washington, that information is privileged, as that necessarily involves asking why appellant took certain action or did not take certain action based on whatever knowledge he had, which is information protected by the mental process privilege. If appellant's deposition is limited to knowledge, and he testifies to having knowledge, he would be forced to explain his action or inaction, thus violating his mental process privilege. Appellees' showing is insufficient to overcome that privilege.

Moreover, Washington's supervisor was Herron and/or the police chief, and they have been pursued in discovery. Presumably, discovery of other persons or records in the police department and/or in the DHS either have been, or can be, pursued.

**JUDGMENT REVERSED. COSTS TO BE PAID BY APPELLEES.**